**Affirmed in Part, Reversed in Part, and Judgment Rendered in Part; Opinion filed June 14, 2012.**



In The

# Fourteenth Court of Appeals

### NO. 14-10-00936-CV

## CUSTOM TRANSIT, L.P., RICHWAY CARTAGE, INC., AND CUSTOM OPERATIONS, LLC, Appellants

## V.

## FLATROLLED STEEL, INC., Appellee

**On Appeal from the 164th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2006-80851**

## O P I N I O N

Custom Transit, L.P., Custom Operations, LLC, and Richway Cartage, Inc., appeal from a judgment in favor of Flatrolled Steel, Inc. following a jury trial.

We affirm the trial court's judgment as to contract damages and attorney's fees awarded against Custom Transit and Custom Operations. We reverse the trial court's judgment as to actual damages for negligence and exemplary damages awarded against Richway, and render judgment that Flatrolled take nothing from Richway.

**BACKGROUND**

## I.    The Parties

Flatrolled is a Houston-based company that buys and sells carbon flatrolled steel, which is rolled into large coils weighing many tons. Flatrolled processes the coils at its facility in Houston using machinery that unrolls the coils and cuts the steel into sheets that can be packaged and shipped to its customers. These sheets are used to manufacture items such as computer cabinets, electrical boxes, ductwork, and roadway guardrails. Uses such as these require steel with a good surface that can be painted.

Flatrolled obtains some of the steel coils it buys from trading companies; these companies in turn buy coils from foreign manufacturers and then ship them into the Port of Houston. The coils are shipped in large sealed "cans" to protect them during transit.

Flatrolled entered into a direct discharge agreement with Custom Transit, under which Custom Transit agreed to provide direct discharge services in connection with at least eight vessels that delivered steel coils into the Port of Houston in 2006. As a direct discharge company, Custom Transit took possession of steel coil shipments at dockside immediately as stevedores unloaded them from the vessels and arranged for delivery of the coils to Flatrolled's Houston facility.

Custom Transit is a limited partnership. Its general partner is Custom Operations, which has no employees and conducts no business beyond serving as general partner for Custom Transit. Nolan Richardson is Custom Transit's president.

Custom Transit used equipment owned by Richway, including trucks and forklifts, in the course of performing direct discharge services for Flatrolled. Richway itself had no employees in 2006. Bills of lading sometimes were issued under Richway's name to Flatrolled. Members of the Richardson family served as Richway's officers, and also were officers of Custom Transit or bore responsibility for Custom Transit's operations. Flatrolled had no contract with Richway.

Some of the steel coils obtained by Custom Transit for Flatrolled were stored in

2

warehouses before Custom Transit delivered them to Flatrolled. The evidence at trial conflicted with respect to the entity that held leases on the warehouses Custom Transit used to store Flatrolled's steel coils before delivery. Some testimony indicated that Richway held these leases and allowed Custom Transit to use the warehouses without payment. Other testimony indicated that the leases were held by a different entity called "R Enterprises" or "R Warehousing."

## II.     The Dispute

The parties' dispute focuses primarily on 2,455 "weather-sensitive" steel coils. Flatrolled contends that Custom Transit breached the direct discharge agreement by storing these coils in non-climate-controlled warehouses for months before delivery instead of delivering them promptly to Flatrolled. According to Flatrolled, temperature fluctuations that occurred while these coils were stored in non-climate-controlled warehouses resulted in condensation forming externally on the storage cans and on the coils' steel surfaces inside the cans. In turn, this moisture caused rust and staining on the steel that diminished its value by making it unsuitable for use in finished products requiring painting. Flatrolled also contends that Custom Transit lost or failed to deliver another 37 coils.

Flatrolled filed suit in December 2006. In its live petition, Flatrolled asserted multiple claims against Custom Transit, Custom Operations,[1] Richway, and R Enterprises,[2] including breach of contract, negligence, gross negligence, and conversion in connection with the damaged and missing coils. Custom Transit filed a counterclaim for breach of contract predicated on unpaid or underpaid invoices for services provided to Flatrolled.

---

[1] The parties stipulated that Custom Operations is jointly and severally liable in connection with findings against Custom Transit as Custom Transit's general partner. For ease of reference, these two entities are identified collectively as "Custom Transit" below.

[2] The trial court subsequently dismissed R Enterprises from the case. A take-nothing judgment was entered as to R Enterprises, which is not challenged on appeal.

3

**III.    The Verdict**

The case was tried to a jury in March and April 2009.  The jury returned a verdict in which it

- found that Flatrolled and Custom Transit entered into a direct discharge agreement regarding transport of steel coils from the Port of Houston; found that Custom Transit failed to comply with the agreement; and made separate breach-of-contract damage awards for lost and undelivered coils, and for damaged coils;

- answered "no" to a question asking whether Flatrolled failed to comply with its payment obligation to Custom Transit under the direct discharge agreement;

- found that Custom Transit converted Flatrolled's steel coils; found by clear and convincing evidence that Custom Transit acted with malice; and awarded actual damages;

- found that negligence on the part of Custom Transit and Richway proximately caused the loss of Flatrolled's steel coils; found that negligence on the part of Custom Transit and Richway proximately caused damage to Flatrolled's steel coils; and made separate awards for lost and undelivered coils, and for damaged coils;

- attributed 50 percent of the injury-causing negligence to Custom Transit, and 50 percent to Richway;

- found by clear and convincing evidence that the harm to Flatrolled's steel coils resulted from gross negligence on the part of Custom Transit and Richway; and

- awarded punitive damages against Custom Transit and Richway.

Attorney's fees were tried to the court.  The trial court subsequently signed an order

4

awarding attorney's fees and court costs to Flatrolled in connection with its breach of contract claim.

## IV.    The Final Judgment

The trial court signed a final judgment in Flatrolled's favor on July 9, 2010. Flatrolled elected to recover on its contract claim against Custom Transit. The final judgment recites that "Flatrolled's only theory of recovery against Richway is for negligence."

The final judgment ordered that Flatrolled recover actual damages of $959,316.88 from Custom Transit, along with attorney's fees, costs of court, and pre- and post-judgment interest. The final judgment also ordered that Flatrolled recover actual damages of $479,658.44 against Richway, along with pre- and post-judgment interest. The final judgment contains this statement: "However, Flatrolled is entitled to only one satisfaction of actual damages for its total injury of $959,316.88, and to only one satisfaction of pre-judgment and post-judgment interest on actual damages, from any combination of Custom Transit, Custom Operations, and Richway up to the amounts for which each is liable." In addition, the final judgment ordered that Flatrolled recover $959,316.88 in exemplary damages from Richway along with post-judgment interest on that amount.

## V.    Issues on Appeal

Custom Transit and Richway present seven issues on appeal. They contend that the trial court's judgment must be reversed because (1) the jury charge erroneously included an accord and satisfaction instruction in connection with Custom Transit's breach-of-contract counterclaim against Flatrolled; (2) the economic loss rule forecloses Flatrolled's recovery against Custom Transit and Richway on its negligence and conversion claims; (3) Richway owed no duty in tort to Custom Transit; (4) the evidence is legally and factually insufficient to support the jury's awards for damaged coils; (5) the trial court's judgment violates the one satisfaction rule by awarding both contract and tort

5

damages for a single, indivisible injury; (6) the award of exemplary damages against Richway is improper; and (7) the attorney's fees award against Custom Transit is improper.

STANDARDS OF REVIEW

***Legal and Factual Sufficiency of the Evidence.*** Legal insufficiency challenges may be sustained only when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L. REV. 361, 362-63 (1960)); *see also Niche Oilfield Servs., LLC v. Carter*, 331 S.W.3d 563, 569 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

We must consider evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 822. If the evidence allows only one inference, neither jurors nor the reviewing court may disregard that evidence. *Id.* "The traditional scope of review does not disregard contrary evidence in every no evidence review if there is no favorable evidence (situation (a) above), or if contrary evidence renders supporting evidence incompetent (situation (b) above) or conclusively establishes the opposite (situation (d) above)." *Id.* at 810-11. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *Id.* at 822. Accordingly, the ultimate test for legal sufficiency always must focus on whether the evidence would enable reasonable and fair-minded jurors to reach the verdict under review. *Id.* at 827. Legal sufficiency review in the proper light must credit favorable evidence if reasonable jurors could do so, and must disregard contrary evidence unless reasonable jurors could not do so. *Id.* The reviewing court cannot substitute its judgment for that of the trier of fact if

6

the evidence falls within this zone of reasonable disagreement. *Id.* at 822.

In reviewing factual sufficiency, we must consider and weigh all the evidence. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). We can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Id.*

***Duty***. Although the existence of a duty in tort is characterized as a question of law, in some instances resolution of disputed facts may be required to determine whether particular circumstances give rise to a duty of care. *See, e.g.*, *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009); *Transcont. Ins. Co. v. Briggs Equip. Trust*, 321 S.W.3d 685, 695 (Tex. App.—Houston [14th Dist.] 2010, no pet.)

***Expert Testimony.*** Custom Transit's and Richway's appellate challenges focus in part on expert testimony supporting Flatrolled's damage claim predicated on damaged coils. "'If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.'" *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006) (quoting Tex. R. Evid. 702); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588-89 (1993). Expert testimony is admissible when (1) the expert is qualified, and (2) the testimony is relevant and based on a reliable foundation. *Mendez*, 204 S.W.3d at 800. If the expert's evidence is not reliable, it is not evidence. *Id.* Courts must determine reliability from all of the evidence. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 720 (Tex. 1997).

The Texas Supreme Court has set forth six non-exclusive factors to assist courts in determining whether expert testimony is reliable. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995). Those factors are (1) the extent to which the theory has or can be tested; (2) the extent to which the technique relies on the expert's subjective interpretation; (3) whether the theory has been subject to peer review and/or

7

publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the nonjudicial uses that have been made of the theory or technique. *Mendez*, 204 S.W.3d at 801 (citing *Robinson,* 923 S.W.2d at 557).

The Texas Supreme Court subsequently explained that the *Robinson* factors cannot always be used in assessing an expert's reliability, but concluded there still must be some basis for the opinion offered to show its reliability. *Mendez*, 204 S.W.3d at 801 (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998)). In those circumstances, expert testimony is unreliable if there is simply too great an analytical gap between the data and the opinion proffered. *Mendez*, 204 S.W.3d at 800. A reviewing court is not required to ignore gaps in an expert's analysis or assertions that are simply incorrect, and a trial court is not required to admit evidence connected to existing data only by the expert's *ipse dixit*. *Id.* at 800-01.

Additionally, it is clear that purely conclusory expert opinion testimony cannot support a judgment. "An expert opinion is considered conclusory if it is essentially a 'conclusion without any explanation.'" *Pink v. Goodyear Tire & Rubber Co.*, 324 S.W.3d 290, 296-97 (Tex. App.—Beaumont 2010, pet. dism'd) (quoting *Arkoma Basin Exploration Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 389 & n.32 (Tex. 2008)); *see also Barzoukas v. Found. Design, Ltd.*, 363 S.W.3d 829, 840 (Tex. App.—Houston [14th Dist.] 2012, pet. filed).

## ANALYSIS

The order in which we address the issues on appeal differs from the order in which Custom Transit and Richway have briefed them.

We begin with the first, fourth, and seventh issues, which focus on contract-related arguments pertaining to Custom Transit; Flatrolled's damages for Custom Transit's breach of contract; and attorney's fees in connection with the contract claim against Custom Transit.

8

We next address the third and sixth issues, which focus on whether a tort recovery and exemplary damages are permissible in this case.

In light of our disposition of the third issue, we need not address the second issue concerning the economic loss rule; we also need not address the fifth issue, in which Custom Transit and Richway assert that the trial court's judgment violates the one satisfaction rule by allowing Flatrolled to recover simultaneously against Custom Transit in contract and against Richway in tort for a single, indivisible injury.

## I.     Contract Claims Pertaining to Custom Transit

In the first issue on appeal, Custom Transit contends that the trial court erroneously submitted an accord and satisfaction defense to the jury by way of an instruction in Question No. 4.

Custom Transit asserts that this instruction was erroneous because there is legally insufficient evidence to support an accord and satisfaction defense in connection with Custom Transit's breach of contract claim against Flatrolled predicated on underpaid invoices. It argues that this asserted error requires reversal as to the cluster of jury submissions in Question Nos. 4, and 5 pertaining to Custom Transit's breach of contract counterclaim against Flatrolled. It further argues that this asserted error also requires reversal as to the separate cluster of jury submissions in Question Nos. 2 and 3 pertaining to Flatrolled's "interwoven" claim for breach of contract against Custom Transit predicated on lost or undelivered coils, and on damaged coils.

### A.     Submission of Contract Claims in the Jury Charge

The jury answered "yes" to Question No. 1, which asked: "Did Flatrolled Steel and Custom Transit agree to a direct discharge agreement, regarding the transport of steel coils from the Port of Houston?" Custom Transit does not challenge this finding on appeal.

The jury answered "yes" to Question No. 2, which asked: "Did Custom Transit fail to comply with its obligations under the direct discharge agreement found in

9

Question #1?"  In response to Question No. 3, which was predicated on a "yes" answer to Question No. 2, the jury awarded damages to Flatrolled in connection with Custom Transit's breach of the direct discharge agreement.  The jury awarded separate amounts for (1) lost and undelivered coils; and (2) damaged coils.

Question No. 4 asked:  "Did Flatrolled Steel fail to comply with their payment obligations under the direct discharge agreement found in Question #1?"  This question listed four circumstances for the jury to consider in "determining whether a failure to comply is material . . . ."  The jury then was instructed as follows:  "Failure to comply with an agreement is excused if a different performance was accepted as full satisfaction of performance of the original obligations of the agreement."

The jury answered "no" to Question No. 4.  Because Question No. 5 was predicated on a "yes" answer to Question No. 4, the jury did not answer Question No. 5 pertaining to Custom Transit's damages for Flatrolled's asserted breach of the direct discharge agreement.

## B.      Inclusion of an Accord and Satisfaction Instruction in Question No. 4

Custom Transit assails the inclusion of an accord and satisfaction instruction in Question No. 4 on grounds that the evidence did not warrant submission of such an instruction to the jury.  Custom Transit lodged a "no evidence" objection to this instruction during the charge conference, which was overruled; Custom did not object to the form of this instruction in the trial court and does not challenge its content on appeal.

"The accord and satisfaction defense rests upon a contract, express or implied, in which the parties agree to the discharge of an existing obligation by means of a lesser payment tendered and accepted."  *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 863 (Tex. 2000) (citing *Jenkins v. Henry C. Beck  Co.*, 449 S.W.2d 454, 455 (Tex. 1969)); *see also Huang v. Don McGill Toyota, Inc.*, 209 S.W.3d 674, 681 (Tex. App.— Houston [14th Dist.] 2006, no pet.).  "[F]or this defense to prevail, there must be a dispute and an unmistakable communication to the creditor that tender of the reduced

sum is upon the condition that acceptance will satisfy the underlying obligation." *Lopez*, 22 S.W.3d at 863. "The parties must specifically and intentionally agree to the discharge of one of the parties' existing obligations." *Id*.

It is undisputed on this record that Custom Transit accepted and cashed checks tendered by Flatrolled for amounts less than the totals specified in Custom Transit's invoices. Custom Transit argues that depositing a check for a lesser amount does not establish accord and satisfaction absent a notation on the check stating that it fully satisfies the specified debt. *See Cleveland Reg'l Med. Ctr., L.P. v. Celtic Props., L.C.*, 323 S.W.3d 322, 335 (Tex. App.—Beaumont 2010, pet. denied) ("Acceptance of a tendered check, without more, is not enough to constitute accord and satisfaction . . . . The parties must mutually assent to form a new agreement to satisfy the original obligation, and the parties' intent is controlling."). The checks at issue here contained no such notation.

While we agree that acceptance of tendered checks without more does not establish accord and satisfaction, we conclude that "more" exists on this record even in the absence of a notation on the checks themselves. Flatrolled contends that an express oral agreement existed between Flatrolled and Custom Transit to accept Flatrolled's lesser payments as full satisfaction of the amounts owed to Custom Transit. Flatrolled points to testimony by its owner, Mike Bollman, regarding conversations he had with Custom Transit employee Robbie Hardy:

Q.     . . . Mr. Bollman, what did you do when they started overcharging you?

A.     We called up Robbie. We — we asked her what was going on, and we had talked to her about the fact that it — that our prices had always been 25 cents inside the port, 35 cents outside the port. And she agreed that that's what it was and — and — and didn't know why that the prices was changed on the invoice, and so we short-paid the invoice by the correct amount.

Q.     In two thousand —

A.     Or we short-paid the invoice by the amount that was incorrect and

11

paid the correct amount.

Q. So are you saying that the invoices that Custom Transit would send to you in 2006 were, in large part, at the wrong price? Were they?

A. Yes.

Q. And — and then what would you do with that invoice in terms of how you would handle it?

A. After the first couple of times that we called her and talked to her and — and got it, you know, confirmed with her, you know, that the invoices were incorrect, we just started taking the invoices and — and marking them up and paying the correct amount.

                      *                       *                       *

Q. Now, when you did that, did anybody from Custom Transit ever call you and say, "Hey, . . . [y]ou're paying the wrong rate"?

A. No. They took our check and cashed our check and went on their merry way. They were happy.

Custom Transit contends this evidence is insufficient to establish accord and satisfaction, pointing to contradictory testimony from Hardy in which she (1) denied the existence of an agreement to accept lesser payment; and (2) said she promised only that she would investigate Flatrolled's complaints about the invoices.

We conclude that the evidence proffered during Bollman's testimony sufficed to raise a jury question regarding accord and satisfaction so as to warrant inclusion of an instruction. Considering the evidence in the light most favorable to the verdict and indulging every reasonable inference that would support it, Bollman's testimony enabled reasonable and fair-minded jurors to conclude that (1) Custom Transit agreed via Hardy that the correct price to be paid by Flatrolled was "25 cents inside the port, 35 cents outside the port;" and (2) Hardy confirmed the invoices showing a higher price were incorrect. This evidence, taken in conjunction with undisputed evidence that Custom Transit accepted and cashed Flatrolled's checks paying the invoices at the lower rate, at least raised a fact issue as to whether Custom Transit and Flatrolled agreed to "the discharge of an existing obligation by means of a lesser payment tendered and accepted." *See Lopez*, 22 S.W.3d at 863.

Having concluded that the evidence supported submission of the challenged instruction on accord and satisfaction in Question No. 4, we need not address Custom Transit's remaining arguments in connection with the first issue on appeal.

Custom Transit's only appellate challenge to Question No. 2 — in which the jury answered "yes" when asked whether Custom Transit failed to comply with its obligations under the direct discharge agreement — rests on a contention that Question No. 2 was "interwoven" with Question No. 4. According to Custom Transit, this interweaving means that Question No. 2 was infected by the asserted error in submitting an accord and satisfaction instruction in Question No. 4. Having rejected Custom Transit's appellate challenge to Question No. 4, we conclude there is no basis to disturb the jury's finding in Question No. 2 that Custom Transit failed to comply with its contractual obligations to Flatrolled under the direct discharge agreement.

We overrule the first issue on appeal.

We next address the fourth issue on appeal, which challenges the jury's award for damaged coils in response to Question No. 3.

## II.     Damages for Custom Transit's Breach of Contract

### A.     The Jury's Findings

Question No. 3 asked the jury to find "[w]hat sum of money, if any, if paid now in cash, would fairly and reasonably compensate Flatrolled Steel for its damages, if any, that resulted from Custom Transit's failure to comply" with the direct discharge agreement. The jury made separate findings for lost and undelivered coils in Answer No. 3(A) and damaged coils in Answer No. 3(B).

The submissions in Question No. 3 were framed in terms of the "market value of the Property." The term "market value" was defined as "the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling." The term "Property" was defined as "any one of several of the steel coils at issue in this lawsuit."

13

With respect to lost and undelivered coils, the jury found in Answer No. 3(A) that "the market value of the Property at the time it was agreed to be delivered" totaled $326,721.28. Custom Transit does not challenge on appeal the jury's $326,721.28 damage award pertaining to lost and undelivered coils. Therefore, at a minimum, Flatrolled is entitled to recover this amount for lost and undelivered coils in connection with its contract claim against Custom Transit.

With respect to damaged coils, the jury was instructed to consider "the market value of the Property at the time it was agreed to be delivered less the market value of the Property at the time it was delivered." The jury found this amount to be $632,595.60 in Answer No. 3(B).

In the fourth issue on appeal, Custom Transit challenges the sufficiency and reliability of the evidence Flatrolled proffered at trial to support the jury's $632,595.60 award in Answer No. 3(B) pertaining to the diminished value of damaged coils.

### B.    Analysis of the Challenged Damage Testimony

Flatrolled relied on testimony from Mike Bollman and Tom O'Keefe to support its computation of losses from the diminished value of damaged coils. Bollman owns Flatrolled and served as Flatrolled's representative at trial. He testified about the reduction in market value of 105 coils that were removed from their cans, processed, and determined to be damaged due to the presence or rust or surface blemishes. O'Keefe testified at trial as an expert marine surveyor. O'Keefe opined that the coils identified by Bollman were a "representative sample," and that he would expect an additional 114 to 122 coils to be damaged based on this representative sample.

#### 1.    Bollman

Flatrolled designated Bollman as a fact witness and an expert witness. The trial court signed an order on March 23, 2009, in which it ruled that Bollman could not proffer expert testimony. The trial court did so in response to Custom Transit's motion contending that Texas Rule of Civil Procedure 193.6 mandated exclusion of any expert

testimony from Bollman because Flatrolled did not comply with its discovery obligations under Rules 194 and 195. Flatrolled also invoked the Property Owner Rule as a basis for Bollman's testimony "because the fact is that a property owner can testify to market value." The trial court overruled Custom Transit's trial objection that Bollman should not be allowed to testify under the Property Owner Rule because he lacked the requisite "individual, personal knowledge" regarding the "value of individual items."

### a. Bollman's testimony

Bollman testified at trial that he has owned Flatrolled Steel since its inception in 1995 and has 35 years of experience in buying and selling steel. Bollman testified that he manages a sales force of 15 people; sets prices for selling steel; and supervises production, credit, and shipping departments within Flatrolled. Bollman affirmed that he knows the market value for steel in the industry, and knew the market value for steel coils in 2006; he stated, "I have knowledge of what our cost is and . . . what the market will allow us to sell it for."

Bollman testified about the sensitivity of steel coils to significant temperature changes. Such changes cause condensation to form externally on the storage cans and on the steel coils inside the cans. In turn, the condensation causes rust to form on the surface of the steel coils. Bollman testified that problems arise when the coils have "been having temperature changes over and over and over again multiple times that cause the sweating and then they sweat and then they dry, then they sweat, then they dry." He continued, "The more times they sweat and then they dry, the wors[e] the damage is."

Bollman drew a distinction between "prime steel" and "less-than-prime steel." According to Bollman, the main difference between prime and less-than-prime steel is that prime steel "is of good surface quality." He testified that prime steel "doesn't have rust all over it and it's able to be painted, and the paint will stick to it." He added that steel is classified as less-than-prime even if it is not completely rusted over, or if it is rusted on only one side; he explained that "prime has no surface defects, and non-prime has surface defects." If steel has any surface defects, "[i]t's not going to be prime."

15

Bollman testified that the market value of prime steel is higher than the market value of less-than-prime steel.

Flatrolled identified 2,455 "weather-sensitive coils" that had been retrieved by Custom Transit from eight ships. Flatrolled opened the best-looking storage cans displaying the least amount of exterior damage; it opened 1,317 of the cans and processed the coils they contained. According to Bollman, 105 of the 1,317 processed coils had been damaged by rust or blemishes and subsequently were sold as less-than-prime steel instead of prime steel. Bollman linked the damaged coils to invoices reflecting the sale of the steel at a less-than-prime price, or to specific work orders. Bollman was asked, "[D]oes either the work order or the invoice that's reflected, or both, — does that show — is that the documentation of damage to the coil?" He answered, "Yes."

Bollman testified that he personally examined damaged coils, but could not say precisely how many; in the course of testifying, he identified and described photographs depicting rust on some of the 105 coils. Bollman testified that he went to Richway's facility, inspected some of the coils, and took pictures of some of the coils. Bollman acknowledged that photographs were not taken of every damaged coil because photographing them required Flatrolled to interrupt its processing and "every time we stop our machine . . . we lose money."

Bollman also testified that 55 or 54 of the coils were classified as being damaged based on the contents of the accompanying invoices showing that the coils had been sold at a less-than-prime prices; another 37 coils were classified as being damaged based on an accompanying work order reflecting a notation of rust or staining; and approximately 14 coils had both work orders and invoices. He stated, "[W]e don't have an invoice for every work order and we don't have a work order for every invoice." According to Bollman, a notation that a coil is "stained" means the same thing as a notation that the coil is "rusty."

With respect to coils for which Flatrolled had only an invoice, Bollman testified that an invoice indicating a sale at a less-than-prime price reflected damage to the coil

16

because Flatrolled sells only prime steel "in 99 percent of our cases." He added, "The price shows that it's less than prime." Counsel asked Bollman: "And what you are asking the ladies and gentlemen of the jury to do is to award you the difference between the prime price and the subprime price, correct?" Bollman answered: "Yeah. The non-prime which we had to sell for less than the prime because of the rust."

Custom Transit's attorney asked Bollman, "[D]id you physically see all 105 of these coils unrolled?" Bollman answered, "I probably did or my warehouse superintendent." Bollman testified that he could not answer a question asking him to tell the jury how it could determine which coils he personally had examined. The 105 damaged coils identified by Bollman were listed in Plaintiff's Exhibit 63, a spreadsheet that identified each damaged coil by coil number, vessel name, work order or invoice number, weight, and tag number. Plaintiff's Exhibit 63 was admitted into evidence. According to Bollman, the average weight of the 105 coils was 18,416 pounds.

Bollman testified that the market value for steel coils in prime condition in mid- to late 2006 was 50 cents a pound; during the same period, the market value for steel coils in less-than-prime condition was 35 cents per pound. To compute diminished market value due to damage, Bollman first multiplied the total weight of the 105 damaged coils by the prime value of 50 cents per pound; from this amount, he subtracted the less-than-prime value of the same quantity of steel. Over Custom Transit's objection, Bollman testified that "[t]he differential in the prime versus non-prime, what we took a loss on, is 290,058" with respect to the 105 damaged coils that were opened and processed.

### b. Challenges to Bollman's testimony

On appeal, Custom Transit assails Bollman's testimony on grounds that it is conclusory and speculative because "Bollman himself was not personally familiar with the extent of the damage to the 105 coils."

Contentions that testimony is "conclusory" and "speculative" often are asserted in the same breath and argued together. These are distinct concepts, and we will address

17

them separately.

Testimony is conclusory "if it is essentially a 'conclusion without any explanation.'" *Pink,* 324 S.W.3d at 296-97 (quoting *Arkoma Basin Exploration*, 249 S.W.3d at 389 & n.32); *see also Barzoukas*, 363 S.W.3d at 840. Bollman's testimony is not conclusory because he sufficiently explained the basis for a determination that coils were damaged, and for the computation of a market price differential attributable to the damage. Therefore, we reject Custom Transit's contention that Bollman's testimony is purely conclusory.

Custom Transit's speculation challenge to Bollman's testimony focuses on the Property Owner Rule, under which "a property owner is qualified to testify to the value of her property even if she is not an expert and would not be qualified to testify to the value of other property." *Reid Road Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 852-53 (Tex. 2011) (citing *Porras v. Craig*, 675 S.W.2d 503, 504 (Tex. 1984)). "The rule is based on the presumption that an owner will be familiar with her own property and know its value." *Speedy Stop*, 337 S.W.3d at 853. The Texas Supreme Court has applied this principle to valuation of real property, *see id.*; the supreme court also has applied it to valuation of personal property. *See Redman Homes, Inc. v. Ivy*, 920 S.W.2d 664, 668-69 (Tex. 1996); *see also Taiwan Shrimp Farm Village Ass'n, Inc. v. U.S.A. Shrimp Farm Dev., Inc.*, 915 S.W.2d 61, 71 (Tex. App.—Corpus Christi 1996, writ denied), *cited with approval in Speedy Stop*, 337 S.W.3d at 853.

Entities such as corporations are treated "the same as natural persons for purposes of the Property Owner Rule, with certain restrictions on whose testimony can be considered as that of the property owner." *Speedy Stop*, 337 S.W.3d at 849.

A two-pronged test governs the inquiry into whether a witness properly can testify under the Property Owner Rule on behalf of an entity other than a natural person. First, "[T]he Property Owner Rule is limited to those witnesses who are officers of the entity in managerial positions with duties related to the property, or employees of the entity with substantially equivalent positions and duties." *Id.* Second, "[T]he Property Owner Rule

18

falls within the ambit of Texas Rule of Evidence 701 and therefore does not relieve the owner of the requirement that a witness must be personally familiar with the property and its fair market value, but the Property Owner Rule creates a presumption a to both." *Id*.; *see also Preston Reserve, L.L.C. v. Compass Bank*, No. 14-11-00045-CV, ___ S.W.3d ___, 2012 WL 1564014, at *4 & n.2 (Tex. App.—Houston [14th Dist.] April 24, 2012, no pet. h.).

Custom Transit does not dispute the Property Owner Rule's applicability to the steel coils at issue in this case; Bollman's qualifications under *Speedy Stop*'s first prong to opine as the owner of Flatrolled who occupies a managerial position with duties related to the steel coils; or Bollman's personal familiarity with the market value of prime versus less-than-prime steel at the relevant time. Custom Transit's appellate challenge focuses on whether Bollman demonstrated sufficient personal familiarity with the number of damaged coils and their condition to testify about diminished market value under the Property Owner Rule's second prong. We conclude that Bollman did so.

Contrary to Custom Transit's suggestion, demonstrating Bollman's personal familiarity with the coils does not require testimony specifying the precise number of coils that Bollman visually inspected. Bollman demonstrated his familiarity with the steel obtained and sold by Flatrolled; the effects of moisture on steel; and the resulting impact on pricing when Flatrolled sold the steel. Bollman testified that "I buy the steel . . . and then . . . I sell it." He also testified that he manages Flatrolled's 15-person sales force by "set[ting] the prices and . . . com[ing] out with a price book for the salespeople," and that Flatrolled sells only prime steel in "99 percent of our cases." He observed damaged coils himself. He further testified that he participates in supervising production, credit, and shipping at Flatrolled to "make sure everything gets done the way it's supposed to."

In light of this testimony, Bollman's computation was not unduly speculative. Bollman demonstrated personal familiarity with the condition and value of the coils based on market knowledge, sales invoices, work orders reflecting damage to specific

coils, and visual inspection. Bollman's familiarity with the condition and value of the coils satisfied the Property Owner Rule. *See Taiwan Shrimp Farm Village Ass'n, Inc.*, 915 S.W.2d at 71 (testimony of corporation's president and principal shareholder under the Property Owner Rule supported award for diminished market value of pumps damaged by sandblasting and immersion in salt water based on price differential between undamaged and damaged pumps).

### 2. O'Keefe

The trial court signed an order on March 23, 2009, in which it denied Custom Transit's motion seeking to exclude testimony from O'Keefe on grounds that Flatrolled failed to make proper discovery disclosures.

On March 24, 2009, Custom Transit filed a separate motion seeking to exclude O'Keefe's expert testimony as unreliable under *Daubert*, 509 U.S. at 588-89, and *Robinson*, 923 S.W.2d at 557. Custom Transit contended in its *Daubert*/*Robinson* motion that O'Keefe should not be permitted to testify regarding industry standards; Custom Transit's conduct in handling the coils; asserted breaches of any duties owed to Flatrolled by Custom Transit; asserted damage to the coils attributed to Custom Transit's handling of them; or the value of less-than-prime steel.

The trial court conducted a hearing on the *Daubert*/*Robinson* motion during trial. At the hearing's conclusion, the trial court expressly ruled that O'Keefe could not testify regarding the number of coils that were damaged; the use of a representative sample analysis to calculate the total number of damaged coils based upon a subset of 105 damaged coils identified by Flatrolled; the market value of coils; or whether Custom Transit and Richway breached duties owed to Flatrolled. The trial court ruled that O'Keefe could testify about "industry standards as to storage of the coils;" the fact that "coils were damaged;" and what he was told by Flatrolled regarding the number of coils that had been determined to be damaged.

The trial court revisited this ruling during trial after determining that Custom

20

Transit had proffered and obtained admission of Defendant's Exhibit 1931 into evidence. This exhibit is an affidavit signed by O'Keefe in which he opined about the use of a representative sample technique to determine the extent of Flatrolled's cargo damage in this case. In light of this affidavit's admission into evidence notwithstanding the ruling at the *Daubert*/*Robinson* hearing, the trial court allowed O'Keefe to testify as an expert marine surveyor at trial regarding representative sampling.

### a. O'Keefe's testimony

O'Keefe testified that he has more than 30 years of experience as a marine surveyor working in ports along the Gulf of Mexico, including the Port of Houston. As a marine surveyor, O'Keefe inspects cargo on ships and in port for damage. O'Keefe testified, "If there is a problem, I have to try to establish how much of that cargo's been affected so that I can protect [the charterer's] . . . interest." He added, "You're trying to establish the cause and the full extent of damage so that you can determine what their liability is and whose fault it is." He has performed hundreds of surveys on steel coils; according to O'Keefe, rust on cargo is "one of the main things we deal with." O'Keefe previously testified as an expert in federal court concerning cargo damage.

O'Keefe testified that a marine surveyor is "hardly ever able" to visually inspect every piece of cargo for damage "unless it's a very, very small shipment." He continued, "[I]f you're dealing with hundreds of coils, the only way to do it is to take a representative sample. Then you have to apply the representative sample to establish a percentage that the coils are damaged . . . and then you apply that percentage to the remaining coils."

O'Keefe relied on conversations with Bollman and information obtained from Flatrolled; photographs; inspection of coils; depositions taken during the case; his knowledge of Port of Houston warehouses; and documentation including summaries prepared by Flatrolled and bills of lading. O'Keefe also referred to his affidavit, Defendant's Exhibit 1931. O'Keefe testified, "I was out there . . . when [Bollman] . . . ran a couple of coils to show us some of the rust that was on the coils . . . ." He added,

21

"[W]e all met and went through all the coils that had been delivered to Flatrolled in the warehouse, went through every one of them." In determining which cans to open for processing and sale, Flatrolled chose the cans that were in the best condition because the coils in those cans were less likely to be severely damaged.

O'Keefe addressed practical considerations involving inspection of the particular cargo at issue here. O'Keefe testified that it is impractical to visually inspect every steel coil, "especially when there's hundreds of coils." He testified, "Number one, you can't decan them all because you're exposing them to further damage." He continued, "[E]ven decanning a coil . . . you're not going to get a real good idea of the effect any rust has had on a coil without running it out on a line. You can't run them all out on a line because they have to be decoiled." According to O'Keefe, "When you recoil them, they won't go back as square as they were. They'll telescope . . . and then you've got storage problems." O'Keefe also testified that a steel coil cannot be put back in its can after it has been removed because "the wrapper's destroyed."

O'Keefe opined that using a representative sample is an appropriate way to determine the extent of damage to coils that have not yet been removed from their storage cans. "It's the only way that you can economically [and] feasibly establish the extent of damage to all the coils. You can't open them all." He agreed with a statement that described representative sampling as "standard practice in the industry."

O'Keefe testified that out of 2,455 cans containing weather-sensitive coils, Flatrolled had opened 1,317 as of the time of trial — representing 53 percent of the total — and determined in the course of processing them that 105 coils were damaged. According to O'Keefe, 10 percent is generally accepted in the maritime survey industry as a proper representative sample for purposes of estimating cargo damage. He opined that he was "more than comfortable" with using the 1,317-coil sample as a representative sample for purposes of computing the total number of damaged coils among the 2,455 weather-sensitive coils at issue.

O'Keefe was asked, "Do you use error rates in your line of work?" He answered,

"Never in 35 years . . . I've never been asked to establish an error rate, and I've done inspections on all kinds of steel, household goods, automobiles. Never dealt with error rates."

To compute the number of damaged coils among those that had not yet been removed from their cans and processed, O'Keefe proceeded in two steps by (1) dividing the number of already-identified damaged coils by the number of processed coils to determine a percentage; and then (2) applying a percentage multiplier to the number of as-yet unprocessed coils.

The figure obtained in step (1) was approximately eight percent. O'Keefe opined that at least 10 percent of the remaining unprocessed coils likely would be damaged. He explained his rationale for using a 10 percent multiplier on grounds that the eight percent figure was based on Flatrolled's processing of only the "best-looking" cans containing coils that were "the least likely to be severely damaged." He testified, "[S]o that means the ones that look the worst or [might be] . . . more heavily affected are the ones that are remaining, so I'd expect it at least to be 10 percent, if not a little more."

Turning to step (2), O'Keefe multiplied the number of unprocessed coils by 10 percent to compute a total of additional damaged coils ranging from approximately 114 to approximately 122.[3] O'Keefe agreed with a statement that the 10 percent multiplier would be "typical and customary and reasonable in the industry."

---

[3] The range arises because different figures were used at trial, and in O'Keefe's affidavit, for the number of unprocessed coils. Although the trial court allowed O'Keefe to testify at trial regarding representative sampling, it limited the scope of his testimony on this point to statements contained in his affidavit: "Since the affidavit's already there, go with the affidavit. Say 'Here are the numbers in the affidavit. How did you get to these numbers,' and let's leave it at that." O'Keefe's affidavit, which was signed approximately eight months before trial, was based on 1,217 unprocessed coils. Plaintiff's Exhibit 62, which was admitted into evidence at trial, contained revised figures based on 1,138 unprocessed coils. Applying O'Keefe's 10 percent multiplier to these totals creates a range from approximately 122 on the high end to approximately 114 on the low end. Notwithstanding the trial court's admonition that both sides were "stuck with what's in the affidavit," O'Keefe also was questioned during trial about the 1,138 figure in Plaintiff's Exhibit 62 and agreed that 10 percent of that figure equals "roughly" 114.

## b.      Challenges to O'Keefe's testimony

On appeal, Custom Transit does not challenge O'Keefe's qualifications to testify as an expert marine surveyor. Custom Transit contends that O'Keefe's testimony is legally and factually insufficient to support the jury's $632,595.60 award in Answer No. 3(B) pertaining to damaged coils because his testimony is conclusory, speculative, and "unreliable on its face."[4]

As a threshold matter, we agree with Custom Transit's contention that it did not waive its sufficiency challenge to O'Keefe's testimony by proffering Defendant's Exhibit 1931 for admission into evidence at trial. Custom Transit objected to O'Keefe's testimony at trial under *Daubert* and *Robinson* and obtained a ruling; in so doing, Custom Transit gave fair notice of its contentions to Flatrolled and to the trial court. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex. 1998). Custom Transit subsequently presented a no-evidence challenge to Answer No. 3(B) in a post-trial motion to disregard filed under Texas Rule of Civil Procedure 301, and a factual sufficiency challenge to Answer No. 3(B) in a motion for new trial filed under Texas Rule of Civil Procedure 329b. These motions reiterated Custom Transit's *Daubert/Robinson* challenges, and the trial court expressly overruled both motions. The admission of O'Keefe's affidavit during trial does not waive a sufficiency challenge. *See Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245, 252 (Tex. 2004) ("If [the expert's] . . . opinion is found to be unreliable, and thus no evidence, [exhibits] . . . which are merely representations of [the expert's] . . . opinion . . . would be no evidence for the same reasons."). Flatrolled does not argue otherwise.

---

[4] In closing argument, Flatrolled's counsel urged the jury to compute the diminished market value for all damaged coils by adding (1) Bollman's $290,058 estimate for the diminished market value of the 105 damaged coils identified from those that were processed; and (2) the diminished market value of the damaged coils among those that had not yet been processed. To obtain the latter figure, counsel urged the jury to multiply the average weight per coil of 18,416 pounds by the number of additional damaged coils that had not been processed yet, and then apply the discounted price per pound for less-than-prime steel. Counsel suggested to the jury that the diminished market value for all damaged coils should be $632,595.60, which corresponds to the jury's determination in Answer No. 3(B).

We again perform a separate analysis of Custom Transit's contentions that the testimony is conclusory and speculative. We again reject Custom Transit's contention that the challenged testimony is conclusory. O'Keefe did not merely offer "a 'conclusion without any explanation.'" *Pink,* 324 S.W.3d at 296-97 (quoting *Arkoma Basin Exploration Co.*, 249 S.W.3d at 389 & n.32). O'Keefe explained the practical reasons necessitating use of a representative sample to compute the number of additional damaged coils among the coils that had not yet been processed. He also explained his rationale for using a 10 percent multiplier based on Flatrolled's selection of only the "best looking" cans for processing, which meant that the remaining cans were more likely to contain damaged coils. These explanations are sufficient to confirm that the testimony is not conclusory.

In arguing undue speculation, Custom Transit challenges this testimony on grounds that O'Keefe (1) personally "inspected only three or four of the 105 processed coils" and did not inspect any unprocessed coils; (2) conducted no tests or statistical analysis to support his opinion; (3) cited no publications; (4) could not specify an error rate for his opinion; and (5) did "nothing to rule out any alternative causes of any damage to the coils, such as conditions on the vessels which shipped the coils to the Port of Houston." According to Custom Transit, these circumstances mean that Flatrolled "failed to bridge the analytical gap between O'Keefe's opinions and the data on which he purportedly relied for his opinions."

Custom Transit's first ground for challenging O'Keefe's testimony does not demonstrate that his testimony is unreliable. As a testifying expert, O'Keefe properly could rely on facts and data "perceived by, reviewed by, or made known" to him. Tex. R. Evid. 703; *see also Taubensee Steel & Wire Co. v. Macsteel Int'l USA Corp.*, No. 9C1505, 2011 WL 1651239, at *2-3 (N.D. Ill. May 2, 2011) (Under *Daubert* and Federal Rule of Evidence 703, expert engineer properly relied on reports from steel purchaser's employee, who inspected 466 of 729 steel coils for rust, and others in formulating opinion that extent of rust on steel coils exceeded purchaser's specifications); *Great Am.*

25

*Ins. Co. v. M/V HANDY LAKER*, No. 96 Civ. 8737(BSJ), 2002 WL 32191640, at *3 & n.9 (S.D.N.Y. Dec. 20, 2002) (expert marine surveyors' opinions regarding cargo damage, which were based on "the pictures and documents presented to them," were not impermissibly speculative).

Under this standard "it is not necessary for a testifying expert to have personally inspected an object as a prerequisite to offering expert testimony regarding that object." *Schronk v. City of Burleson*, No. 10-07-00399-CV, ___ S.W.3d ___, 2009 WL 2215081, at *19 (Tex. App.—Waco July 22, 2009, pet. denied). This principle applies to an expert marine surveyor's testimony offered in connection with determining the diminished market value of damaged cargo. *See SPT Fed. Credit Union v. Big H Auto Auction, Inc.*, 761 S.W.2d 800, 802-03 (Tex. App.—Houston [1st Dist.] 1988, no writ) (expert marine surveyor's opinion regarding shrimp boat's market value was admissible under Rule 703 notwithstanding testimony that "he had never inspected or viewed the shrimp boat in question").

Custom Transit's second, third, and fourth grounds for challenging O'Keefe's testimony focus on testing, publications, and error rate. These grounds highlight the imperfect fit between expert testimony concerning certain types of technical issues and reliability factors that arose in the context of cases involving expert scientific testimony regarding causation, epidemiology, and the like. *See, e.g.*, *Robinson*, 923 S.W.2d at 557.

The Texas Supreme Court has recognized that the *Robinson* factors are not exclusive, and that "some subjects do not lend themselves to scientific testing and scientific methodology." *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 639 (Tex. 2009); *see also Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 39 (Tex. 2007); *Gammill*, 972 S.W.2d at 724. "Testing is not always required to support an expert's opinion, but lack of relevant testing to the extent it was possible, either by the expert or others, is one factor that points toward a determination that an expert opinion is unreliable." *Whirlpool Corp.*, 298 S.W.3d at 642; *see also In re the Complaint of Peter Knudson*, No. 08-00505-CG-B, 2010 WL 1994906, at *6 (S.D. Ala. May 17, 2010) (Challenges to proffered

expert testimony from a naval architect, marine surveyor and marine safety expert regarding injury occurring on a dry-docked vessel "do not easily lend themselves to the factors identified in *Daubert*. Rather, this is one of those situations in which the relevant reliability concerns focus upon personal knowledge or experience."). "If testing of critical aspects of an expert's testimony has not taken place either by the expert or others in the relevant scientific or expert community, then an explanation of why it has not is an important consideration in evaluating the expert opinions and determining whether they are substantially more than merely the expert's conclusory, subjective opinion." *Whirlpool Corp.*, 298 S.W.3d at 642-43.

Custom Transit does not specify the nature of the statistical analysis that it contends is required to support O'Keefe's conclusions and establish an acceptable error rate, nor does it explain why a 53 percent sample size is invalid. We do not believe that these factors deprive O'Keefe's testimony regarding cargo damage of all validity so as to make that testimony the equivalent of "no evidence" or almost "no evidence." *See Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co.*, 769 F. Supp. 2d 269, 286-87 (S.D.N.Y. 2011) (rejecting *Daubert* challenges to testimony from expert marine surveyor and expert chemical engineer who opined that discoloration of liquid phenol cargo occurred from exposure to damaging elements such as heat or contaminants during international transport). Custom Transit appropriately and vigorously cross-examined O'Keefe on these points at trial. The impact of these points was for the jury to determine. *See Ledesma*, 242 S.W.3d at 40 ("Ford presented a strong defense, but ultimately the jury rejected it.").

Here, as in *Cedar Petrochemicals*, the asserted absence of hypothesis testing, an error rate, and literature does not invalidate the testimony at issue regarding the source of cargo damage. *See Cedar Petrochemicals*, 769 F. Supp. 2d at 286 ("The experts have drawn only limited conclusions regarding the timing and potential causes of the discoloration, which are tied to the existing data by their experience in chemical engineering and the shipping industry . . . and by straightforward logical analysis.")

27

(citation omitted). "The 'analytical gap' between their conclusions and the data is not wide." *Id*. Insofar as Custom Transit assails the lack of inspections by O'Keefe of unprocessed coils, we note that O'Keefe explained the practical difficulties involved in decanning coils and exposing them to further damage. *Cf. Taber v. Roush*, 316 S.W.3d 139, 152 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ("The dearth of prospective testing in support of the natural forces of labor theory is explained by ethical considerations that preclude a prospective study subjecting mothers and babies to potential injury while measuring excessive traction.").

Custom Transit's fifth basis for challenging O'Keefe's expert testimony focuses on its contention that O'Keefe failed to "rule out" alternative sources of damage to the coils. Custom Transit arguably overreaches here; there is room for discussion regarding the degree to which admissibility and sufficiency determinations depend on exclusion of proffered or alternative explanations for a particular event. "While an expert should address evidence that contradicts his conclusions, '[i]t is not required . . . that an expert categorically exclude each and every possible alternative cause in order to render the proffered testimony admissible.'" *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 235 (S.D.N.Y. 2004) (alteration in original) (quoting *Astra Aktiebolag v. Andrx Pharm., Inc.*, 22 F. Supp. 2d 423, 488 (S.D.N.Y. 2002)); *see also Cedar Petrochemicals,* 769 F. Supp. 2d at 287 (quoting *U.S. Info. Sys., Inc.*, 313 F. Supp. 2d at 235); *cf. Whirlpool Corp.*, 298 S.W.3d at 639 ("Evaluating whether expert testimony has been conclusively disproved by the opposing party is not the same as considering whether the proponent of the testimony satisfied its burden to prove the testimony is relevant and reliable.").

In any event, O'Keefe adequately addressed the alternative explanation that the coils rusted during transit by sea rather than while they were in storage. O'Keefe tried to locate surveys for the vessels to determine conditions when the vessels left their ports of origin, but was unable to do so. O'Keefe opined that the absence of notification to Flatrolled regarding problems with the coils at the beginning or the end of the voyages

indicated that the coils were in good condition when they arrived at the Port of Houston. "[A]ny time there's a problem on the ship, everybody finds out. I mean, everybody starts hollering because nobody wants to get blamed for anything that the ship's responsible for." Bollman testified that Flatrolled received no notification of problems with the coils "because they were good when they left the ship." Additionally, O'Keefe performed a hatch survey on the vessel *Hui An* and concluded that the cargo of the *Hui An* was in good condition when it arrived in the Port of Houston in July 2006. When O'Keefe subsequently examined coils from the *Hui An* after they had been delivered to Flatrolled, the coils were weathered, aged, and covered with dirt.

O'Keefe went to Flatrolled's facility to look at coils "at least eight or nine times" between December 2006 at the date of trial. O'Keefe looked at photographs of three damaged coils that were run on the line, and examined the remaining coils in their cans at Flatrolled's warehouse. O'Keefe opined that the rust on the coils is "all freshwater in origin" and did not result from saltwater. He concluded that the rust on the coils was "freshwater in origin, from condensation." He further concluded that storage of the coils damaged them during the period in which they were kept in a non-climate controlled warehouse before delivery to Flatrolled.

### C.    Conclusion Regarding Challenged Damages Testimony

We reject Custom Transit's legal and factual sufficiency challenges to the evidence supporting the jury's award in Answer No. 3(B) pertaining to the diminished value of damaged coils. We overrule the fourth issue on appeal.[5]

---

[5] Flatrolled also obtained jury findings in its favor against Custom Transit on Flatrolled's claims for conversion; negligence pertaining to lost coils; and negligence pertaining to damaged coils. The jury awarded damages of $231,472.20 for conversion; $326,721.28 for negligently lost coils; and $632,595.60 for negligently damaged coils. With respect to the negligence claims, the jury apportioned 50 percent of the injury-causing conduct to Custom Transit and 50 percent to Richway. Flatrolled elected to recover on its contract claim against Custom Transit in the final judgment. *See Hatfield v. Solomon,* 316 S.W.3d 50, 59 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ("When a party receives favorable jury findings on two or more theories of recovery that yield different damage amounts, that party may elect the measure of damage upon which the party wishes to recover."). Because judgment against Custom Transit is supported by the jury's breach of contract finding in Question No. 2 and the damage awards in response

In light of this disposition, Flatrolled is entitled to recover damages on its breach of contract claim against Custom Transit consisting of (1) $326,721.28, the unchallenged amount awarded in Answer No. 3(A) for lost and undelivered coils; and (2) $632,595.60, the amount awarded in Answer No. 3(B) for damaged coils.

## III.  Attorney's Fees on Flatrolled's Contract Claim Against Custom Transit

In the seventh issue on appeal, Custom Transit challenges the trial court's award of attorney's fees.  Custom Transit contends that Flatrolled cannot recover such fees because it cannot recover on its contract claim or, alternatively, cannot recover the full amount of contract damages awarded in response to Question No. 3.  Having rejected both contentions in the course of overruling the first and fourth issues on appeal, we accordingly overrule the seventh issue.

## IV.  Recovery in Tort Against Richway

In addition to its contract recovery against Custom Transit, Flatrolled also pursued negligence and gross negligence claims against Richway.  Flatrolled had no contractual relationship with Richway.

One cluster of questions in the jury charge pertained to lost coils.  The jury answered "yes" as to Richway and Custom Transit, and "no" as to Flatrolled, in response to Question No. 12.  This question asked whether the negligence, if any, of Custom Transit, Richway, or Flatrolled proximately caused the loss of Flatrolled's property.  In response to Question No. 13, the jury awarded $326,721.28 as damages for the lost coils. In response to Question No. 14, the jury attributed 50 percent of the injury-causing negligence to Richway and 50 percent to Custom Transit with respect to lost coils.  The jury also answered "yes" as to Richway and Custom Transit in response to Question No. 15, which asked, "Do you find by clear and convincing evidence that the harm to Flatrolled Steel's Property resulted from gross negligence?"

_____

to Question No. 3, we do not address Custom Transit's conditional challenges in issue two concerning the viability of negligence and conversion claims submitted against Custom Transit in Question Nos. 8-10 and 12-19.

30

The jury answered a separate cluster of questions pertaining to damaged coils. In response to Question No. 16, which asked whether the negligence of the listed parties caused damage to Flatrolled's property, the jury again answered "yes" as to Richway and Custom Transit, and "no" as to Flatrolled. In response to Question No. 17, the jury awarded $632,595.60 as the "difference between the market value of the Property in Harris County, Texas, immediately before and immediately after the damage to Flatrolled Steel's Property." In response to Question No. 18, the jury again apportioned 50 percent of the injury-causing negligence to Richway and 50 percent to Custom Transit. In response to Question No. 19, the jury again found by clear and convincing evidence that the harm to Flatrolled resulted from gross negligence.

After a bifurcated trial, the jury assessed punitive damages against Richway of $1.25 million in connection with the gross negligence finding pertaining to lost coils, and $5 million in connection with the gross negligence finding pertaining to damaged coils.[6]

The trial court's final judgment orders that Flatrolled can recover $479,658.44 in actual damages from Richway, which equates to 50 percent of the total damages for lost and damaged coils found in response to Question Nos. 13 and 17. Flatrolled voluntarily remitted its punitive damage award against Richway to $959,316.99.

## A.     Identifying the Negligence Theory Submitted in the Jury Charge

In the third issue on appeal, Richway contends that Flatrolled cannot assert a viable negligence claim against it because the evidence is legally insufficient to establish circumstances giving rise to a duty of care owed by Richway in connection with storage of Flatrolled's coils in warehouses that were not climate-controlled.

To sustain its negligence claim, Flatrolled was required to establish that Richway violated a legal duty owed to Flatrolled. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000). Addressing the source of any duty owed by Richway to Flatrolled requires

---

[6] The jury assessed separate punitive damage awards against Custom Transit. Flatrolled elected to recover on its contract claim against Custom Transit in the final judgment.

us at the outset to identify the precise nature of the negligence submissions against Richway in Question Nos. 12 and 16.

The evidence at trial was disputed regarding the identity of the leaseholder for the warehouses Custom Transit used to store Flatrolled's coils. Some of the trial testimony indicated that Richway held the leases. Flatrolled relies on this testimony in contending that its tort claim against Richway rests on a negligent undertaking theory. According to Flatrolled, "Richway voluntarily assumed a duty, not part of a contract, to warehouse Flatrolled's coils for an extended period." Flatrolled further contends that the trial court submitted a negligent undertaking theory against Richway in the jury charge. *See id.*[7] Richway, in contrast, contends that Flatrolled's tort claim and the jury submissions are based on a negligent activity theory.

The Texas Supreme Court highlighted the distinction between negligent undertaking and negligent activity in *Torrington*, 46 S.W.3d at 837-38. "While Texas law imposes no general duty to 'become [a] good Samaritan,' we have recognized that a duty to use reasonable care may arise when a person undertakes to provide services to another, either gratuitously or for compensation." *Id*. at 837 (citations omitted); *see also Crooks v. Moses*, 138 S.W.3d 629, 637 (Tex. App.—Dallas 2004, no pet.) ("In other words, if one undertakes to make the premises safe for others, he or she owes a duty to use due care.").

A jury presented with a negligent undertaking claim should be instructed that the defendant was negligent if (1) the defendant undertook to perform services that it knew or should have known were necessary for the plaintiff's protection; (2) the defendant failed to exercise reasonable care in performing those services; and (3) either the plaintiff relied on the defendant's performance, or the defendant's performance increased the plaintiff's risk of harm. *See Torrington,* 46 S.W.3d at 838; *Restatement (Second) of Torts* §§ 323,

---

[7] Richway contends that Flatrolled's pleadings were insufficient to assert a negligent undertaking claim. For purposes of this analysis, we assume that Flatrolled adequately pleaded a negligent undertaking theory.

324A (1965); *see also* Texas Pattern Jury Charge 71.8 (2010).[8]

Analogizing to case law addressing the distinction between premises liability claims and negligent activity claims, *Torrington* noted that "we have rejected the argument that a broad-form negligence question, without more, can support a judgment against a possessor of land." *Torrington*, 46 S.W.3d at 838 (citing *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 529 (Tex. 1997)). The supreme court applied similar reasoning to negligent undertaking. *Id.*

In *Olivo*, the supreme court "held that a broad-form negligence question that omitted instructions about the knowledge and risk-of-harm elements of a premises liability claim was insufficient." *Id.* (citing *Olivo*, 952 S.W.2d at 529). "Premises liability cases are similar to undertaking cases in that the plaintiff seeks to impose a duty on another to take protective action based upon special circumstances or the relationship between the parties." *Id.* "In premises liability cases, like undertaking cases, a possessor of land may be held liable only if certain conditions are met." *Id.*; *see also Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 776 (Tex. 2010) ("We have recognized that negligent activity encompasses a malfeasance theory based on affirmative, contemporaneous conduct by the owner that caused the injury, while premises liability encompasses a nonfeasance theory based on the owner's failure to take measures to make the property safe."); *Del Lago Partners, Inc.*, 307 S.W.3d at 788 (Wainwright, J., dissenting) ("Although a species of negligence, premises liability cases are predicated on a property possessor's failure to warn or make safe dangerous or defective conditions on property; negligent activity cases arise from contemporaneous actions or omissions in the conduct of people.").

Consistent with the approach used for cases in the premises liability realm, *Torrington* concluded that negligent undertaking liability could not properly be

---

[8] Depending on the context of a particular claim, the reliance element may be framed in terms of reliance by the party to whom services were rendered or reliance by the party to be protected. *See* Texas Pattern Jury Charge 71.8 cmt. (2010). The distinction is not material to the resolution of this appeal.

predicated on a broad-form negligence question that (1) defined "negligence," "ordinary care," and "proximate cause" in the conventional manner under Texas law, but (2) did not instruct as to additional, specific elements addressing the defendant's undertaking to perform services, failure to exercise reasonable care in performing those services, reliance, and increased risk of harm. *Torrington*, 46 S.W.3d at 837-38 & n.6.

We apply *Torrington*'s teaching here. Question Nos. 12 and 16 are broad-form negligence submissions in which "negligence,"[9] "ordinary care,"[10] and "proximate cause"[11] are defined in the conventional manner. As in *Torrington*, these broad-form negligence questions do not submit any elements specific to a negligent undertaking claim. We therefore conclude that Question Nos. 12 and 16 submit a negligent activity theory against Richway rather than a negligent undertaking theory. *See id.*

Flatrolled contends that Question Nos. 12 and 16 nonetheless should be analyzed as negligent undertaking submissions in which certain undertaking elements have been omitted. Flatrolled stresses that Richway objected to Question Nos. 12 and 16 at the charge conference on no-evidence grounds, but did not object on "no duty" grounds and did not object to the omission of the additional negligent undertaking elements. Relying

---

[9] The jury was instructed that "'[n]egligence' means failure to use ordinary care that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances." *See* Texas Pattern Jury Charge 2.1 (2010).

[10] The jury was instructed that "'[o]rdinary care' means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances." *See* Texas Pattern Jury Charge 2.1 (2010)

[11] The jury was instructed that "[p]roximate cause' means that cause which, in a natural and continuous sequence, unbroken by any new and independent cause, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event, but if an act or omission of any person not a party to the suit was the 'sole proximate cause' of an occurrence, then no act or omission of any other person could have been a proximate cause." The first portion of this definition comports with language approved in *Rudes v. Gottschalk*, 324 S.W.2d 201, 207 (Tex. 1959). The most recent edition of the pattern jury charge revises the definition of "proximate cause" slightly in light of *Transcontinental Insurance Co. v. Cump*, 330 S.W.3d 211, 222-23 (Tex. 2010). *See* Texas Pattern Jury Charge 2.4, 3.1 (2010). The difference is not material to the resolution of this appeal.

on Texas Rule of Civil Procedure 279, Flatrolled argues that any necessary but omitted negligent undertaking elements should be deemed to be found in support of the trial court's judgment against Richway if there is sufficient evidence to support such implied findings.

Flatrolled's contention fails because there is a difference between omitting certain elements of a single theory — which is addressed by Rule 279's deemed finding mechanism — and omitting all elements of an entirely separate and distinct theory. *See Olivo*, 952 S.W.2d at 529. This case involves the latter circumstance. *See id.* ("The missing . . . premises defect elements about knowledge and risk of harm are not necessarily referable to the negligent activity question submitted to the jury.").

Because a negligent undertaking theory is separate and distinct from a negligent activity theory, the deemed finding mechanism does not operate here to fill in the gaps for negligent undertaking elements that were not submitted in Question Nos. 12 and 16. *See id.; see also Torrington*, 46 S.W.3d at 838. This conclusion applies regardless of whether Richway objected on "no duty" grounds during the charge conference. *See Olivo*, 952 S.W.2d at 529 ("The premises defect elements cannot be deemed found against Graham. The simple negligence question submitted to the jury relates only to the theory that Graham was liable for control over any negligent activities.").[12]

This conclusion dovetails with *Entex v. Gonzalez*, 94 S.W.3d 1, 5-6 (Tex. App.— Houston [14th Dist.] 2002, pet. denied), a post-*Torrington* decision in which this court

---

[12] Additionally, Richway asserted in its post-trial motion to disregard certain jury findings under Texas Rule of Civil Procedure 301 that the jury's answers to Question Nos. 12 and 16 were immaterial. The trial court expressly overruled this motion in the final judgment. These steps preserved a contention that the negligence submissions in Question Nos. 12 and 16 were immaterial as to Richway. *See Torrington*, 46 S.W.3d at 840 ("But in *Olivo*, the defendant owed no duty toward the plaintiff unless specific factual predicates were established. Without any determination that the specific factual predicates were met, the question did not submit a controlling issue. In other words, absent any determination that the factual predicates giving rise to a legal duty were satisfied, the defendants' failure to use reasonable care was of no legal consequence.") (citing *Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 720 (Tex. 1995)); *see also Nat'l Plan Adm'rs v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 704 (Tex. 2007) ("Even though it did so, [defendant] . . . was not required to object to the immaterial question."); *Olivo*, 952 S.W.2d at 530 (judgment rendered on appeal when broad-form negligence question was submitted without instructions on premises liability factors).

refused to treat a broad-form negligence question as a negligent undertaking submission. "[T]he jury charge had no instructions or definitions containing the additional elements, nor were any such instructions or definitions sought by [the plaintiffs or the defendant] . . . ." *Id*. at 5. "Therefore, although the jury charge was correct with regard to a theory of recovery based on a negligent activity, it does not support liability based on the duty asserted by [the plaintiffs] . . . ." *Id*. "In other words, despite the absence of a charge error, the judgment cannot be affirmed based on violation of a duty that the jury was not asked to consider." *Id*. at 5-6. "As in *Torrington*, the charge in this case was . . . not sufficient to support a finding of liability based on negligent undertaking." *Id*. at 5 n.3.

We likewise reject Flatrolled's alternative suggestion that Question Nos. 12 and 16 should be analyzed as submitting claims pursuant to a statutory duty of care Richway owed as a "warehouse." *See* Tex. Bus. & Com. Code Ann. § 7.204(a) (Vernon 2011) ("A warehouse is liable for damages for loss of or injury to the goods caused by its failure to exercise care with regard to the goods that a reasonably careful person would exercise under similar circumstances."); *see also id*. § 7.102(a)(13) ("'Warehouse' means a person engaged in the business of storing goods for hire.").

The missing statutory elements addressing whether Richway acted as a "warehouse" that was "engaged in the business of storing goods for hire," and whether Richway satisfied a warehouseman's statutory duty to "exercise care with regard to the goods that a reasonably careful person would exercise under similar circumstances," are "not necessarily referable to the negligent activity question submitted to the jury." *See Olivo*, 952 SW.2d at 529; *cf. Smith v. Moody Gardens, Inc.*, 336 S.W.3d 816, 818-19 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (distinguishing among duties predicated on negligence, premises liability, and unique statutory duties applicable only to ice skating rinks under Tex. Health & Safety Code Ann. § 760.006(a) (Vernon 2010); jury charge incorporated unique statutory duty to inspect ice skating surface and maintain it in good condition). Consistent with *Entex*, we conclude that the tort judgment against Richway cannot be affirmed based on Richway's asserted status as a "warehouse" or on

36

the claimed violation of a separate, statutory warehouseman's duty that "the jury was not asked to consider." *See Entex*, 94 S.W.3d at 5-6.

The upshot is that the existence of a duty, upon which submission of Question Nos. 12 and 18 depends, must be analyzed in terms of a negligent activity claim.

**B.     Evidence Pertaining to Duty of Care**

Because the focus here is on negligent activity, the inquiry does not turn on whether a duty arose to take protective action based on special circumstances or the relationship between Richway and Flatrolled. *See Torrington*, 46 S.W.3d at 838. Instead, the duty inquiry focuses on injuries caused by contemporaneous actions or omissions in Richway's conduct. *See Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992) ("Recovery on a negligent activity theory requires that the person have been injured by or as a contemporaneous result of the activity itself rather than by a condition created by the activity."); *see also Del Lago Partners, Inc.*, 307 S.W.3d at 776 ("negligent activity encompasses a malfeasance theory based on affirmative, contemporaneous conduct by the owner that caused the injury"); *Crooks*, 138 S.W.3d at 639 ("For the negligent activity theory of liability to be applicable, the evidence must show that the injuries were directly related to the activity itself.").

Flatrolled relies upon the following contentions to establish circumstances giving rise to a duty of care flowing from Richway to Flatrolled:

1. ". . . Richway voluntarily assumed the duty alleged by Flatrolled" because "Richway took upon itself to warehouse Flatrolled's coils, jointly and as a 'team effort' with Custom Transit, notwithstanding that it had no contractual duty to do so."

2. Testimony from Richway's corporate representative supports a determination that "Richway held leases on the warehouse where the coils were stored."

3. Richway's website "showed its control of warehousing at those locations."

4. " . . . [I]ndividuals who ran Richway's operations — who also were officers of

37

Custom Transit — knowingly allowed Flatrolled's coils to be warehoused in improper conditions at these Richway facilities."

5. "[I]t was eminently foreseeable that Richway's failure to perform that duty with care, including its failure to store the coils in climate-controlled conditions, would increase the risk of harm to the coils through corrosion or rusting."

6. ". . . Richway's decision to store the coils assumed a duty of care also owed in tort by Custom Transit."

7. ". . . Flatrolled relied on Richway's undertaking because it expected the coils would be protected in a climate-controlled environment if kept for extended periods, as they had been in the past for brief, temporary storage."

Flatrolled's first contention that Richway "voluntarily assumed the duty" by "[taking] upon itself to warehouse Flatrolled's coils" pertains to negligent undertaking. *See Torrington*, 46 S.W.3d at 838. So do Flatrolled's fifth, sixth, and seventh contentions. *See id*.

As discussed above, Question Nos. 12 and 16 did not submit a negligent undertaking claim. Furthermore, these contentions do not support the existence of a duty of care in connection with a negligent activity claim; instead, they reflect an effort to "impose a duty on another to take protective action based upon special circumstances or the relationship between the parties." *See id*; *see also Olivo*, 952 S.W.2d at 529; *Entex*, 94 S.W.3d at 5-6 & n.3. A negligent activity claim focuses on whether Flatrolled was injured "by or as a contemporaneous result of the activity itself," *see Keetch*, 845 S.W.2d at 264, or whether there was "affirmative, contemporaneous conduct" by Richway that caused Flatrolled's injury, *see Del Lago Partners, Inc.*, 307 S.W.3d at 776. The activity to which Flatrolled seeks to link Richway concerns storage of steel coils in non-climate-controlled warehouses under conditions (including the presence of dirt floors) that allowed rust-causing condensation to form on the coils as temperatures fluctuated.

38

The analysis of Richway's activity begins with the undisputed fact that Richway itself had no employees as of the time of trial, and had none in 2006. Richway owns equipment such as trucks and forklifts used by Custom Transit to perform direct discharge services, and bills of lading sometimes were issued under Richway's name to Flatrolled. Conflicting evidence was proffered at trial concerning which entity held leases on the warehouses Custom Transit used to store Flatrolled's steel coils. Some of the testimony indicated that Richway held these leases and allowed Custom Transit to use the warehouses without payment. Other testimony indicated that the leases were held by a different entity called "R Enterprises" or "R Warehousing."

Flatrolled emphasizes testimony indicating that Richway held leases on the warehouses. Flatrolled also points to a statement from Richway's website: "We occupy 300,000 square feet of inside storage and have the largest outside storage available at the Port of Houston in Greensport Industrial Park." Richway's website referred to Custom Transit as one of Richway's locations.

Flatrolled further emphasizes testimony concerning Richway's role as part of a "team effort" with related companies, including Custom Transit, to provide direct discharge services. Richway's corporate representative, Krishnakant Shukla, testified as follows:

Q. So, the work that Richway Cartage did, was that work carried out by these other affiliate companies?

A. Affiliate companies are doing the services. Richway Cartage was not doing it. So, their employees were doing the services.

\*           \*           \*

Q. So, employees from other Richway-related entities would perform work back in 2006 for Richway Cartage?

A. Yeah, the clerical work and accounting, I can speak of. I don't know about operations because Richway Cartage was not involved in operations.

Q. But Richway Cartage was involved in operations to the extent that its equipment and land was used in operations?

A. Yeah, that's correct.

39

Custom Transit's corporate representative, Chance Richardson, testified as follows:

> Q. Does Custom Transit pay Richway Cartage anything for the use of the various warehouses?
>
> A. Not to my knowledge.
>
> Q. But Custom Transit does use those warehouses, right?
>
> A. Yes.
>
> Q. And as part of Custom Transit's providing direct-discharge services, other Richway-related entities were involved, correct?
>
> A. They – they helped out. Yes.
>
> Q. And they help out with the trucks for delivery, right?
>
> A. Equipment. Uh-huh.
>
> Q. And that would include Richway Cartage's trucks, right?
>
> A. Right.
>
>            *            *            *
>
> Q. In your mind, are the various Richway entities one family that all helped provide services to customers?
>
> A. We help out. Yes.
>
> Q. And the Richway family of customers [sic] jointly work together in order to provide good service to the customers, right?
>
> A. To try and provide a seamless solution. Yeah.
>
> Q. And one of those customers was Flatrolled Steel back in 2006, correct?
>
> A. Correct.
>
> Q. But you would agree with me that Custom Transit's work for Flatrolled Steel back in 2006 was definitely a joint effort between Custom Transit, Richway Cartage, and R Enterprises, right?
>
> A. There was a team effort.
>
> Q. Among at least those three entities, correct?
>
> A. Right.

Consistent with this testimony, Flatrolled highlights additional testimony establishing that Richway's officers also were officers of Custom Transit or bore responsibility for Custom Transit's operations.

This evidence demonstrates, at most, that Richway owned equipment used by another entity that provided direct discharge services; held leases on warehouses used by another entity in connection with direct discharge services provided by another entity; was not otherwise involved in direct discharge operations; and had no employees. There is no contention that Richway is liable as an owner or occupier of land based on duties owed to invitees, licensees, or trespassers. *See generally Mayer v. Willowbrook Plaza Ltd. P'ship*, 278 S.W.3d 901, 909-10 (Tex. App.—Houston [14th Dist.] 2009, no pet.). On this record, no act or omission by Richway has been identified as part of affirmative, contemporaneous conduct by which Flatrolled claims to have been injured. *Cf. id.* at 910 (rejecting negligent activity as basis for liability because defendant "was engaged in no activity — negligent or otherwise — when" injury occurred); *Crooks*, 138 S.W.3d at 639 ("the facts of this case cannot support a negligent activity cause of action because of the lack of contemporaneous activity"). Overlap of officers among various entities provides no basis for recognizing a duty flowing from Richway to Flatrolled based on negligent activity; this is especially so given that the trial court granted a directed verdict as to Flatrolled's claim that Richway was liable for Custom Transit's conduct based on theories of alter ego, piercing the corporate veil, and "single enterprise."

The record here reveals no evidence pertaining to any activity or contemporaneous conduct by Richway that would give rise to a duty of care in connection with a negligent activity claim. Therefore, no negligence recovery is available against Richway and Questions Nos. 12 and 16 are immaterial as to Richway. *See Torrington*, 46 S.W.3d at 840; *Olivo*, 952 S.W.2d at 530; *see also Nat'l Plan Adm'rs, Inc.*, 235 S.W.3d at 704 ("Because [defendant] . . . did not owe [plaintiff] . . . a . . . duty, the question should not have been submitted, the question is immaterial, and it cannot support a judgment for [plaintiff] . . ."). We sustain issue three as to Richway.[13]

---

[13] In light of this disposition, we need not address the second and fifth issues raised by Custom Transit and Richway.

## C.  Exemplary Damages

In the sixth issue, Richway contends that Flatrolled cannot recover exemplary damages against it because the underlying negligence recovery is foreclosed.  We agree. *See AVCO Corp., Textron Lycoming Reciprocating Engine Div. of AVCO Corp. v. Interstate Sw., Ltd.*, 251 S.W.3d 632, 662 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("Exemplary damages are not available unless the plaintiff establishes that it sustained actual loss or injury as the result of an underlying tort."); *see also Fed. Express Corp. v. Dutschmann*, 846 S.W.2d 282, 284 (Tex. 1993) (per curiam) ("Recovery of punitive damages requires a finding of an independent tort with accompanying actual damages.").  We sustain the sixth issue as to Richway.

## CONCLUSION

We reverse the trial court's judgment insofar as it awards actual damages for negligence, exemplary damages, pre-judgment interest, post-judgment interest, and taxable costs against Richway.  We render judgment that Flatrolled take nothing as to Richway.  We affirm the trial court's judgment in all other respects.


/s/      William J. Boyce
        Justice


Panel consists of Justices Brown, Boyce, and McCally.