**Affirmed and Memorandum Opinion filed August 25, 2015.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-13-00948-CV

---

### RWH HOMEBUILDERS, LP, Appellant/Cross-Appellee

### V.

### BLACK DIAMOND DEVELOPMENT LLP AND KIRBY FRANK, INC., Appellees/Cross-Appellants

---

**On Appeal from the 133rd District Court
Harris County, Texas
Trial Court Cause No. 2011-39246**

---

## M E M O R A N D U M   O P I N I O N

In this appeal, appellees/cross-appellants, Black Diamond Development LLP and Kirby Frank, Inc. contend that the trial court erred by declaring that appellant/cross-appellee, RWH Homebuilders, LP, had a right to purchase fifteen lots without first satisfying liens on the property. RWH Homebuilders asserts that there is no legally sufficient evidence to support the trial court's determination of a fair market value of $2.4 million for the lots. We affirm.

BACKGROUND

This appeal primarily concerns the enforcement of a "right of repurchase" arising from a contract entered into by Black Diamond and the developer of property located north of Memorial Drive between Westcott and Shepherd.

In 2006, Y-H Sabinal (the Developer) purchased certain property to develop the land for a gated community of up-scale townhomes and villas (the Caceres subdivision). In connection with the acquisition of the Caceres subdivision, the Developer received a development loan from Regions Bank (the Bank). At the time of the loan, RWH Homebuilders[1] had already agreed to purchase twenty percent of the lots in the Caceres subdivision.

In May of 2006, the Developer targeted a discrete number of high-end, highly qualified builders to participate in building homes in the Caceres subdivision. The Developer decided to sell half of the lots in the Caceres subdivision to RWH Homebuilders and half of the lots to Black Diamond. The Developer executed two lot purchase contracts in which each homebuilder agreed to purchase fifty percent of the lots in the Caceres subdivision.

Both lot purchase contracts contained a section entitled "Right to Repurchase." The right of repurchase section in each lot purchase contract provided that if one builder decided not to build on a lot, the other builder would have the first option to buy that lot before it was offered to anyone else. Reciprocal rights of repurchase in favor of the other builder were included in both of the lot

---

[1] RWH Homebuilders, LP, is referred variously throughout the underlying case and this opinion as RWH Homebuilders, Rohe & Wright Builders, and RWH. RWH Homebuilders, LP is the legal entity and Rohe & Wright is its nickname. In its findings of fact, the trial court found that "[w]hile Defendant challenges whether Plaintiff RWH Homebuilders, LP, had the right of repurchase, as opposed to any other entity, it is clear that references in the lot purchase contracts to Rohe & Wright Builders were meant to be as to Plaintiff RWH Homebuilders, LP." We will refer to appellant as RWH Homebuilders.

purchase contracts executed by the builders.

Over the course of twelve months in 2008, RWH Homebuilders and Black Diamond purchased the lots in accordance with their lot purchase contracts. In order to finance its purchase of the lots, Black Diamond received a loan from the Bank and the Bank received a deed of trust.[2] At approximately the same time, RWH Homebuilders purchased its respective lots with financing from the Bank.

In January 2010, Black Diamond informed RWH Homebuilders that Black Diamond was no longer paying its banks on loans in the Caceres subdivision. Black Diamond also represented that it would not be paying its share of homeowners' association assessments or property taxes. Black Diamond then entered into negotiations with the Bank to purchase its loans encumbering its lots at a discount. On April 19, 2011, Black Diamond and the Bank executed an agreement, in which Black Diamond acquired the right to purchase the notes and liens encumbering its lots in the Caceres subdivision (the "Regions Contract"). The Bank afforded RWH Homebuilders the same opportunity. Black Diamond began searching for an investor to finance the $1.425 million buyout price for the Bank. RWH Homebuilders also entered into an agreement with the Bank to purchase its notes and found an investor to finance the purchase price.

On May 4, 2011, Black Diamond emailed RWH Homebuilders, asking if it would be willing to waive its repurchase rights. These negotiations were never finalized. Instead, Black Diamond sent a letter to RWH Homebuilders on May 11, 2011, informing it of its intention to sell fifteen of its lots in the Caceres subdivision. Black Diamond then entered into an agreement with Lovett Custom Homes, Inc. on May 20, 2011 ("the Lovett Homes Contract"), in which Black

---

[2] The parties also purchased some of the lots with financing from IBC Bank. Only the lots financed by the Bank are at issue in this appeal.

Diamond contracted to sell the fifteen lots. Under this agreement, Lovett Homes would acquire the lots under a deed in lieu of foreclosure and Black Diamond and its guarantors would be released from any obligations under the notes and liens. This agreement was never finalized.

On May 24, RWH Homebuilders responded to Black Diamond's letter by stating that it was electing to exercise its option to purchase the lots, subject to confirmation and approval of the purchase price. The letter further stated that "RWH is ready to proceed with the purchase of the Regions Lots once market value has been determined."

After receiving RWH Homebuilders's letter, Black Diamond entered into an agreement with Kirby Frank,[3] in which Kirby Frank agreed to purchase the loans securing the fifteen lots from the Bank ("the Kirby Frank Contract"). This agreement called for the acquisition of the fifteen lots in the same manner in which the lots were purported to be sold outright to Lovett Custom Homes, Inc. under the Lovett Homes Contract.

On June 1, Black Diamond and RWH Homebuilders met to discuss market value for the fifteen lots. Chad Muir, a part owner of RWH Homebuilders, testified that representatives of Black Diamond stated that they had entered into an agreement with Kirby Frank. Muir further testified that the Black Diamond representatives informed him that they were not allowed to agree to market value without Frank Liu's consent.

On June 13, Black Diamond sent a letter to RWH Homebuilders alleging that it failed to properly exercise the option to repurchase. Black Diamond stated that the right of repurchase expired because RWH Homebuilders's letter

---

[3] Both Lovett Homes and Kirby Frank, Inc. are owned and controlled by the same person, Frank Liu.

conditioned its acceptance upon "confirmation and approval of the purchase price." On June 14, Kirby Frank posted the lots for public foreclosure.

RWH Homebuilders sued Black Diamond and Kirby Frank under the Uniform Declaratory Judgment Act, seeking a determination of its right to purchase the fifteen lots. RWH Homebuilders also sought a temporary injunction to forestall the foreclosure sale of the fifteen lots. The trial court granted the temporary injunction on November 21, 2011. The parties proceeded to a bench trial, in which the trial court signed a judgment in favor of RWH Homebuilders.

The trial court also signed findings of fact and conclusions of law. The trial court issued these relevant findings of fact, among others:

18. The Court finds that Plaintiff RWH Homebuilders, LP did have a right of repurchase under PX-7, the Black Diamond lot purchase contract.

29. Regions Bank agreed for Black Diamond to purchase its loans for the 15 Black Diamond lots in Caceres for a discounted note payoff. For the payment of $1.425 million, Regions Bank would release Black Diamond from all loan and interest obligations and return the 15 lots to Black Diamond free and clear of any liability for the Regions Bank loans.

30. Black Diamond began dealing with potential investors to raise the $1.425 million buyout price for Regions Bank.

32. Black Diamond could not find an investment option where title to the lots would not be transferred to a third party.

33. Black Diamond and its counsel believed that transfer of the lots to a third party would trigger Rohe & Wright's right of repurchase rights, and asked Rohe & Wright to waive its option.

35. Ultimately, as seen in PX-8, Black Diamond sent notice to Rohe & Wright that it had an option to repurchase the 15 lots in Caceres financed by Regions Bank.

38. As found in PX-11, on May 24, 2011, Rohe & Wright timely accepted Black Diamond's tendered option to purchase the 15 lots financed by Regions Bank.

45. Before the parties could meet to discuss market value, Black Diamond

5

contracted to sell the 15 lots to Lovett Homes on May 20, 2011.

46. As reflected by PX-45, the purpose of this agreement was for Black Diamond to sell the 15 Regions lots to Lovett Homes. The lot sale agreement in PX-45 called for Lovett Homes to acquire the 15 lots indirectly by an assignment to Lovett Homes of the Regions Contract, which was the discounted note payoff agreement in PX-42. Lovett Homes would obtain the 15 lots under a deed in lieu of foreclosure process under which Black Diamond and its Guarantors Tom Zenner and Bonner Ball would be released from any obligations under the notes and liens that were subject of the Regions Contract, PX-42.

49. Black Diamond started negotiations with Lovett Homes to execute what was called a loan purchase agreement, but despite its name, the agreement still called for the purchase of the 15 Regions Bank lots.

50. At the last minute, the purchaser was changed from Lovett Homes, which was owned and controlled by Frank Liu, to another entity that was owned and controlled by Frank Liu, Defendant Kirby Frank, Inc.

51. This agreement with Kirby Frank, PX-46, although styled an acquisition of loans, called for the acquisition of the 15 Regions Bank lots in the same manner in which the lots were purported to be sold outright to Lovett Homes under PX-45, the lot sale contract between Black Diamond and Lovett Homes.

52. Just like how the Lovett Homes lot sale agreement in PX-45 called for the assumption of Black Diamond's rights to the Regions Contract, with a release of Black Diamond and its Guarantors, and acquisition of the lots by deed in lieu of foreclosure, the loan sale agreement with Kirby Frank in PX-46 also called for the very same procedure to acquire title to the 15 Regions Bank lots.

60. The Court also finds that Rohe & Wright should be entitled to purchase the lots for the "then market value" free and clear of any claim from Kirby Frank.

63. In obtaining Black Diamond's rights under the Regions Contract, Kirby Frank expressly agreed that it would be subject to, or bound by, Rohe & Wright's rights of repurchase.

65. The Court thus finds that Rohe & Wright has the right to repurchase the 15 Regions Bank lots free and clear of any claims of Kirby Frank . . . .

84. The Court thus finds that Rohe & Wright validly exercised its option to

6

repurchase and that the "then market value" that the Court finds is $160,000 per lot for a total of $2,400,000.

In its conclusions of law, the trial court stated:

99. Rohe & Wright has a right of repurchase to acquire the 15 Regions Lots from Black Diamond.

100. Rohe & Wright validly accepted Black Diamond's tender of that right of repurchase, and Rohe & Wright should be able to purchase those lots for the then market value which is 2.4 million.

102. Rohe & Wright shall take those lots free and clear of any claims by Kirby Frank.

RWH Homebuilders filed this appeal, challenging the trial court's value determination of the fifteen lots. Black Diamond and Kirby Frank filed a cross-appeal, challenging the trial court's conclusion that RWH Homebuilders was entitled to purchase the lots free and clear of Kirby Frank's rights. RWH Homebuilders did not file any brief in response to the appellees' cross-appeal.

## STANDARD OF REVIEW

When specific findings of fact and conclusions of law are filed and a reporter's record is before the appellate court, the findings will be sustained if there is evidence to support them and we will review the legal conclusions drawn from the facts found to determine their correctness. *TMC Worldwide, L.P. v. Gray*, 178 S.W.3d 29, 36 (Tex. App.—Houston [1st Dist.] 2005, no pet.). A trial court's findings of fact in a bench trial have the same force and dignity as the jury's verdict upon questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). When the trial court acts as a factfinder, its findings are reviewed under legal and factual sufficiency standards. *Id*.

We review the trial court's conclusions of law de novo. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Conclusions of law are

7

upheld if the judgment can be sustained on any legal theory the evidence supports. *Waggoner v. Morrow*, 932 S.W.2d 627, 631 (Tex. App.—Houston [14th Dist.] 1996, no writ). Incorrect conclusions of law do not require reversal if the controlling findings of fact support the judgment under a correct legal theory. *See id*.

When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See id*. at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id*. The evidence is legally insufficient when (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id*. at 810.

In a factual sufficiency review, we must consider and weigh all of the evidence in a neutral light. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The evidence is factually insufficient only if we conclude that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust, regardless of whether the record contains some evidence of probative force in support of the verdict. *Id*.

The factfinder is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *See City of Keller*, 168 S.W.3d at 819. We may not substitute our judgment for that of the factfinder merely because we reach a

8

different conclusion. *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988).

ISSUES AND ANALYSIS

Black Diamond and Kirby Frank contend that the trial court erred by determining that RWH Homebuilders had a right to purchase the fifteen lots free and clear of Kirby Frank's rights. RWH Homebuilders asserts that the evidence is legally insufficient to support the trial court's value determination.

**I.     The Evidence is Sufficient to Support the Trial Court's Conclusion that RWH Homebuilders Had a Right to Purchase the Lots**

In three issues, Black Diamond and Kirby Frank argue that RWH Homebuilders's claim is precluded as a matter of law because (1) Kirby Frank purchased the notes from the Bank, which were superior to RWH Homebuilders's right of repurchase; (2) the Kirby Frank Contract excluded third party beneficiaries; and (3) RWH Homebuilders failed to properly exercise the right of repurchase.

**A. Right of Repurchase**

Black Diamond and Kirby Frank first contend that RWH Homebuilders did not have a right to purchase the lots because (1) Black Diamond never had superior title to the lots; (2) the right of repurchase was subject to the Bank's liens; (3) RWH Homebuilders is estopped from claiming the right of repurchase is superior; and (4) Kirby Frank is subrogated to the Bank's development loan.

RWH Homebuilders's entire case centers on the "right of repurchase." A right of first refusal, as a preemptive right, requires the property owner to first offer the property to the person holding the right of first refusal at the stipulated price and terms in the event that the owner decides to sell the property. *Riley v. Campeau Homes (Tex.), Inc.*, 808 S.W.2d 184, 187 (Tex. App.—Houston [14th Dist.] 1991,

9

writ dism'd). Unlike an option contract, a right of first refusal does not give the holder the power to compel an unwilling owner to sell. *See id*. An owner does not have to sell and, until the owner decides to sell, there is nothing to exercise and it is not possible to fix a certain purchase price. *Id*. However, once an owner decides to sell, there is an obligation to offer the holder of the right of first refusal the opportunity to buy the burdened property on the terms offered by a bona fide purchaser. *Id*.

An option, on the other hand, provides the holder of the option the right to compel a sale of property on the stated terms before the expiration of the option. *Id*. at 188. A right of first refusal ripens into an option when the owner elects to sell. *Id*. When an owner is required to notify the holder of a right of first refusal of the owner's election to sell, "the right matures into an enforceable option when the owner gives the required notice." *Id*. (quoting *Holland v. Fleming*, 728 S.W.2d 820, 822−23 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.)).

Although both parties refer to this right as a "right of repurchase" or an "option," it is a right of first refusal.[4] Black Diamond's lot purchase contract expressly states that:

> In the event that after closing on the purchase of Lots, [Black Diamond] decides to resell any or all of those lots without a residence constructed thereon ("the Resold Lots"), then [the Developer] shall have the right to repurchase those Lots at the lesser of then market value or the original Purchase Price. [The Developer] shall assign this right to repurchase to Rohe & Wright Builders and, in the event Rohe & Wright Builders does not elect to repurchase, [the Developer] may purchase the Resold Lots.

---

[4] This right has been variously referred to in cases as a right of first refusal, preemptive right to purchase, or preferential right to purchase. *See Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 644 (Tex. 1996); *Sanchez v. Dickinson*, 551 S.W.2d 481, 485 (Tex. Civ. App.—San Antonio 1977, no writ).

Because the lot purchase contract requires Black Diamond to first offer the property to RWH Homebuilders in the event that it decides to sell the property, it is a right of first refusal. *See Riley*, 808 S.W.2d at 187.

Frank Liu, the representative for Kirby Frank, was the first to testify at trial. Liu testified that he originally tried to purchase the fifteen lots from Black Diamond, which was reflected in the Lovett Homes Contract. The Lovett Homes Contract was titled "Purchase and Sale Agreement" and stated that "[Black Diamond] desires to sell the Lots (directly or indirectly) and [Lovett Homes] desires to acquire the Lots (directly or indirectly), subject to the terms and conditions of this agreement." Liu stated that he was aware of RWH Homebuilders's right of repurchase. Section C of the Lovett Homes Contract expressly states that under Black Diamond's lot purchase contract, RWH Homebuilders has an option to repurchase the lots if Black Diamond intended to sell them prior to constructing a home. This contract further stated that Black Diamond provided RWH Homebuilders notice of its intention to sell and that RWH Homebuilders exercised its option to purchase the lots. The Lovett Homes Contract stated that Lovett Homes could acquire the lots directly with cash or indirectly, "pursuant to an assignment of the Regions Contract and a deed in lieu of foreclosure from [Black Diamond] in consideration of a release of [Black Diamond] and each guarantor with respect to any obligations under the notes and liens that are the subject of the Regions Contract." The contract also stated that it would terminate if RWH Homebuilders exercised its repurchase option. Thus, the Lovett Homes Contract was never finalized.

Instead, Kirby Frank and Black Diamond executed the Kirby Frank Contract, which was similarly titled "Purchase and Sale Agreement." The Kirby Frank Contract stated that "[Black Diamond] desires to assign the Regions

11

Contract to [Kirby Frank] at the First Closing." The contract further provided that "[t]he assignment of the Regions Contract is *subject to any rights of RWH* pursuant to its exercise of the repurchase option relating to the Regions Lots." (Emphasis added). The agreement stated that:

> [Kirby Frank] acknowledges that RWH's exercise of its repurchase options with respect to the Regions Lots and IBC Lots requires that the market value and purchase price be determined. [Black Diamond] shall not agree to any market value or purchase price without first obtaining [Kirby Frank's] prior written direction and/or consent, which shall be in [Kirby Frank's] sole direction.

The Kirby Frank Contract also stated that at the first closing, Kirby Frank would release Black Diamond "from and agree that [Black Diamond] shall have no personal liability on the loans secured by the Regions Lots (provided such agreement shall not impair [Kirby Frank's] right to foreclose on the Regions Lots)." After the first closing, pursuant to the contract, Black Diamond was required to execute and deliver a deed in lieu of foreclosure to Kirby Frank.

The Regions Contract was attached to the Kirby Frank Contract. The Regions Contract included a "First Amendment to Sale and Assignment Agreement," which added a condition of closing. This condition stated "[t]he obligation of [Black Diamond] to acquire the Assigned Rights is subject to RWH foregoing exercising its right of repurchase."

Black Diamond argues that it could not convey superior title to the lots because it never had superior title. In support of this proposition, Black Diamond cites to the general proposition that if an express vendor's lien is reserved in a deed to secure the payment of purchase money, superior title remains in the vendor and the vendee acquires an equitable right to obtain legal title by paying the purchase money. *See State v. Forest Lawn Lot Owners Ass'n*, 254 S.W.2d 87, 91 (Tex.

12

1953). Other than citing to this general proposition, Black Diamond does not cite to any case, nor can we find one, stating that Black Diamond was prohibited from selling the lots to RWH Homebuilders.

Black Diamond's lot purchase contract expressly provided that if Black Diamond sold the lots prior to construction, RWH Homebuilders had the right to repurchase those lots at the lesser of then market value or the original purchase price. Although the lot purchase contract was never recorded, Liu testified that he was aware of the right of repurchase and the Kirby Frank Contract stated that "[t]he assignment of the Regions Contract is subject to any rights of RWH pursuant to its exercise of the repurchase option."[5] An unrecorded conveyance of an interest in real property is binding on a subsequent purchaser who had notice of it. *See* Tex. Prop. Code § 13.001(b) ("The unrecorded instrument is binding on . . . a subsequent purchaser who does not pay a valuable consideration or who has notice of the instrument."). Thus, Kirby Frank had actual knowledge of the right of repurchase and cannot claim superior title. *See Madison v. Gordon*, 39 S.W.3d 604, 606 (Tex. 2001) ("Actual notice rests on personal information or knowledge.").

Black Diamond and Kirby Frank further argue that the right of repurchase was subject to the liens secured by the Bank. Black Diamond points to language in the lot purchase contract which states that "title shall be subject only to those matters to which the Lot was acquired, plus any plat and/or easement filed incident to the development of the Subdivision." Muir testified, however, that he believed this provision meant the right of repurchase was subject to "easements or things that would be in a plat."

---

[5] Because the Kirby Frank Contract was subject to RWH Homebuilder's right of repurchase, rather than the Developer's, we find no merit in Black Diamond and Kirby Frank's argument that the Developer did not assign the right of repurchase.

13

Black Diamond and Kirby Frank also assert that RWH Homebuilders is estopped from claiming the right of repurchase is superior because the Developer "agreed by closing documents and deeds that no rights were ahead of Regions liens." Black Diamond directs this court's attention to a closing certificate executed by RWH Homebuilders, in which it states that "there are no liens, claims or charges against the Property whatsoever . . . ." The doctrine of quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by that party. *Eckland Consultants, Inc. v. Ryder, Stilwell Inc.*, 176 S.W.3d 80, 87 (Tex. App.—Houston [1st Dist.] 2004, no pet.). This doctrine applies when it would be unconscionable to allow a party to maintain a position inconsistent with one in which it had acquiesced, or from which it had accepted a benefit. *Id*. We disagree with Black Diamond's interpretation of this language. Although RWH Homebuilders states that there were no liens or claims affecting the property, it did not mention the right of repurchase. Thus, RWH Homebuilders is not estopped from claiming it had a right to purchase the lots.

Kirby Frank contends that it was subrogated to the Bank's development loan with the Developer, which occurred prior to the right of repurchase. Black Diamond and Kirby Frank cite to the general proposition of equitable subrogation, arguing that Kirby Frank received the Bank's priority rights from the development loan. The doctrine of equitable subrogation allows a third party who discharges a lien upon the property of another to step into the original lienholder's shoes and assume the lienholder's right to security against the debtor. *LaSalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616, 619 (Tex. 2007). The development loan between the Bank and the Developer does not give rise to a claim for equitable subrogation because the Bank assigned Kirby Frank its rights to the loan between the Bank and Black Diamond.

14

Based on the evidence adduced at trial and viewing the evidence in the light most favorable to the judgment, we conclude that a reasonable factfinder could conclude that RWH Homebuilders had a right to purchase the fifteen lots. Thus, we find that there is legally sufficient evidence to support the trial court's conclusion. *See City of Keller*, 168 S.W.3d at 827. We further conclude that the evidence supporting the trial court's finding of a right to repurchase is not against the great weight and preponderance of the evidence as to be manifestly unjust. Accordingly, the trial court's conclusion is supported by factually sufficient evidence. *See Jackson*, 116 S.W.3d at 761.

## B. Third Party Beneficiary Clause

Black Diamond and Kirby Frank contend that because the Kirby Frank Contract excludes third party beneficiaries, RWH Homebuilders may not benefit from it.

When interpreting a contract, we examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999). The Kirby Frank Contract contained a provision entitled "Third Party Beneficiaries," stating that "[t]here are no third party beneficiaries to this Agreement and this Agreement is not intended to benefit any third parties, including, without limitation, [the Developer], RWH, [the Bank] or IBC Bank." However, the contract also provided that it was "subject to any rights of RWH pursuant to its exercise of the repurchase option relating to the Regions Lots." Black Diamond and Kirby Frank's interpretation of the contract would render this provision wholly meaningless. Further, RWH Homebuilder's right of repurchase originates from Black Diamond's lot purchase contract.

15

## C. Whether RWH Homebuilders Properly Exercised the Right of Repurchase

Black Diamond and Kirby Frank contend that there is no evidence RWH Homebuilders was ready, willing, and able to close on the lots. They also argue that there is no evidence RWH Homebuilders properly exercised the option.

The trial court found that RWH Homebuilders validly exercised its option and that it was ready, willing, and able to perform its repurchase rights. The record reflects that Black Diamond sent RWH Homebuilders notice on May 11, 2011, informing it of its intention to sell the lots. RWH Homebuilders responded on May 24, stating that it intended to exercise its option to purchase the lots. Muir testified at trial that RWH Homebuilders was willing to pay whatever the court determined the "then market value" of the lots to be. Muir also testified that an investor deposited $1.425 million into an escrow account so that RWH Homebuilders would be able to purchase the lots. Muir stated that an investor arranged for the funds to be available to RWH Homebuilders as a loan for it to purchase the fifteen lots. When asked if RWH Homebuilders would be able to pay for the fifteen lots in the event that the trial court found that the fair market value was more than $1.424 million, Muir stated the following: "We are prepared to pay whatever this Court finds is the then-fair market value." Thus, the evidence that RWH Homebuilders was both willing and prepared to purchase the lots is sufficient to support the trial court's findings that RWH Homebuilders properly exercised its option to purchase the lots and that it was ready, willing, and able to perform.

We overrule Black Diamond and Kirby Frank's cross-appeal.

## II. The Evidence is Legally Sufficient to Support the Trial Court's Value Determination

RWH Homebuilders contends that the evidence is legally insufficient to

support the trial court's $2.4 million value determination because the great weight of the evidence reflects a $1.424 million valuation. In response, Black Diamond and Kirby Frank argue that the trial court's value determination is supported by legally sufficient evidence.

In its findings of fact, the trial court found that RWH Homebuilders was entitled to purchase the lots for the "then market value" free and clear of any claim from Kirby Frank. The trial court found that the "then market value" of the fifteen lots was $160,000 per lot for a total of $2,400,000.

"Market value" is defined as "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying." *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001). Fair market value shall be determined by the factfinder after the introduction by the parties of competent evidence of value. *Village Place, Ltd. v. VP Shopping, LLC*, 404 S.W.3d 115, 133 (Tex. App.—Houston [1st Dist.] 2013, no pet.). Generally, a property owner is qualified to testify to the value of his property even if he is not an expert and would not be qualified to testify to the value of other property. *See Porras v. Craig*, 675 S.W.2d 503, 504 (Tex. 1984). The rule is based on the presumption that an owner will be familiar with his own property and know its value. *Custom Transit, L.P. v. Flatrolled Steel, Inc.*, 375 S.W.3d 337, 352 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

Entities such as corporations are treated "the same as natural persons for purposes of the Property Owner Rule, with certain restrictions on whose testimony can be considered as that of the property owner." *Id*. (quoting *Reid Road Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 849 (Tex. 2011)). A two-pronged test governs the inquiry into whether a witness can properly

17

testify under the Property Owner Rule on behalf of an entity other than a natural person. *Id*. First, the Property Owner Rule is limited to those witnesses who are officers of the entity in managerial positions with duties related to the property or employees of the entity with substantially equivalent positions and duties. *Id*. Second, the Property Owner Rule falls within the ambit of Texas Rule of Evidence 701 and therefore does not relieve the owner of the requirement that a witness must be personally familiar with the property and its fair market value, but the Property Owner Rule creates a presumption as to both. *Id*.

Tom Zenner, a partner and officer of Black Diamond, testified at trial on the market value of the fifteen lots. Zenner stated that he was responsible for Black Diamond's financial obligations and that he negotiated the contracts, put the financing in place, and ran the operations for the Caceres subdivision. Zenner testified that he was familiar with the value of the lots within the Caceres subdivision. Because Zenner testified that he had personal knowledge of the Caceres subdivision and was familiar with Black Diamond's financial obligations, he was allowed to testify on the value of the property under the Property Owner Rule. *See Walsh v. Walsh*, No. 14-10-00629-CV, 2012 WL 3016845, at *4 (Tex. App.—Houston [14th Dist.] July 24, 2012, no pet.) (mem. op.) (providing that witness was allowed to testify under property owner rule regarding the value of corporate property because she was "an officer in a managerial position with duties related to the property").

Nonetheless, such testimony must meet the same requirements as any other opinion evidence. *Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 156 (Tex. 2012). The Property Owner Rule falls under Texas Rule of Evidence 701, which allows a lay witness to provide opinion testimony if it is (a) rationally based on the witness's perception, and (b) helpful to a clear understanding of the

18

witness's testimony or the determination of a fact in issue. Tex. R. Evid. 701; *Justiss*, 397 S.W.3d at 157. Because property owner testimony is the functional equivalent of expert testimony, it must be judged by the same standards. *Justiss*, 397 S.W.3d at 159. Thus, as with expert testimony, an owner's property valuation may not be based solely on the owner's *ipse dixit*. *See id*. An owner may not simply echo the phrase "fair market value" and state a number to substantiate the owner's claim; the property owner must provide the factual basis on which the opinion rests. *See id*. This burden is not onerous, particularly in light of the resources available today. *See id*. But the valuation must be substantiated; a naked assertion of "fair market value" is not sufficient. *See id*. Even if unchallenged, the property owner's testimony must support the verdict, and conclusory or speculative statements do not. *See id*. In addition, evidence of the amount paid in the past to purchase property, by itself, is legally insufficient to support a finding as to the property's market value at a later date. *See Lee v. Dykes*, 312 S.W.3d 191, 195−99 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

At trial, Zenner testified that he was familiar with the value of the lots within the Caceres subdivision and that he believed they were worth "in excess of $170,000 [per lot]." In reaching this conclusion, Zenner stated that Black Diamond originally paid $167,000 per lot in 2008 and that their homes in the Caceres subdivision were selling very well. Zenner testified that he brought a document to the June 1 meeting and gave it to representatives of RWH Homebuilders. The document was admitted into evidence and provides a summary of appraisal information regarding twenty-seven lots in the Caceres subdivision. The document reflects that the appraisals were conducted in January and May 2011 and that the retail appraised value for the fifteen lots was $175,000 per lot or $2,625,000 total. Thus, Zenner's testimony as to the value of the lots was substantiated.

We conclude that the evidence is legally sufficient to support the trial court's value determination of $2.4 million for the lots.

We overrule RWH Homebuilders's sole issue.

## CONCLUSION

We conclude that the evidence is legally and factually sufficient to support the trial court's judgment.

/s/     Ken Wise
         Justice

Panel consists of Justices McCally, Brown, and Wise.