# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-14-00080-CV

### Gattis Electric, Inc., Appellant

### v.

### Theresa Marie Mann, Individually and as Guardian of the Person and Estate of James Lawhon, Appellee

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
### NO. D-1-GN-12-001971, HONORABLE TIM SULAK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Gattis Electric Inc. appeals from the district court's judgment, rendered on a jury verdict of negligence in favor of Theresa Marie Mann, individually, and as guardian of the person and estate of James Lawhon (Lawhon). In three issues, Gattis contends that the district court erred when it denied Gattis's post-trial motions, challenging Lawhon's theory of liability and the sufficiency of the evidence to support the jury's liability finding. Because we conclude that the district court did not err in denying Gattis's post-trial motions, we affirm the district court's judgment.[1]

---

[1]   Pending before this Court are appellee's unopposed motion for leave to file post-submission letter of supplemental authority and appellant's unopposed motion for leave to file post-submission brief. We grant both motions.

**BACKGROUND**

On April 28, 2012, James Lawhon, a journeyman electrician, was severely injured when he came into contact with an energized wire while he was working on a remodeling job at a Goodwill facility in Austin, Texas. The general contractor for the job was Burt-Watts Industries, Inc., and the electrical subcontractor was Gattis. Another company, Kosich, LLC, provided Gattis with electricians to work on the job, and one of the electricians was Lawhon.[2]

The scope of Gattis's electrical work for the project included working with wiring and electrical circuits within the building. Some of this work required the power to be turned off by accessing the electrical breakers in a locked electrical closet. Burt-Watts's superintendent on the job (the superintendent) and a Goodwill maintenance employee had an access key to the electrical closet. Because the building being remodeled was occupied, one of the rules of the project was that power could not be cut off during business hours.[3] Gattis and Goodwill agreed that the power could be shut off between 7:00 and 8:00 each morning during the work week. Although it was disputed at trial, the one-hour window to shut the power off each morning was not sufficient for the electricians to be able to complete their work on time, the superintendent instructed Lawhon to work "hot" (work with the power on) on several occasions, and Gattis was aware of this instruction prior to April 28, 2012, the day Lawhon was injured.[4]

---

[2] At trial, Richard Gattis, the owner of Gattis, answered "Basically, yes" when asked if Kosich "worked like a temp service for you and provided you with manpower."

[3] At trial, the superintendent testified: "And one of the rules for this building that was we cannot cut the power between business hours. It had to be a schedule of early in the morning."

[4] At trial, Richard Gattis testified that Lawhon told him that the superintendent had instructed Lawhon to work "hot," and other witnesses similarly testified that the superintendent

2

The deadline for the job's completion was Monday, April 30, 2012, and failing to meet the deadline would have subjected Gattis to $5,000 per day in liquidated damages. On Saturday, April 28, 2012, the superintendent and the Goodwill maintenance employee were not available to provide their access keys to open the electrical closet to turn the power off. Lawhon, however, was working on that day. He was taking steps to move an exit sign, and, while accessing an overfilled junction box that was above the ceiling tiles, he received an electric shock. Another electrician working with Lawhon called 911, and Lawhon was revived but suffered severe brain injury.

Lawhon brought suit against Goodwill, Burt-Watts, and Gattis, later amending his petition to include Kosich after Gattis filed a motion for leave to designate Kosich as a responsible third party. Goodwill settled with Lawhon, and the case thereafter proceeded to jury trial. Lawhon's theory at trial against Gattis was that Gattis was responsible for the electrical work on the project and that it failed to follow safety protocol to protect its electricians working on the job. According to Lawhon, Gattis was responsible for the overfilled junction box and mislabeled electrical panels in the electrical closet from its prior work for Goodwill in 2010, and Gattis failed to adequately protect its electricians after being told that they were being pressured to work hot.

Lawhon's witnesses included Richard Gattis, electricians working with Lawhon on the job site, the owner of Kosich, a Goodwill employee, experts, and family members. Richard Gattis agreed that Gattis was responsible for the electrical work on the job and for providing

pressured Lawhon to work hot. Richard Gattis testified that he had instructed Lawson not to work hot but also to follow the superintendent's instructions.

3

supervision of that work, that Gattis would have been subject to a penalty if it did not complete the job by April 30, 2012, and that Lawhon told him that Lawhon had "been suggested to [work hot]." The electricians and the owner of Kosich also testified that the superintendent pressured and instructed Lawhon to work hot. The owner of Kosich testified that he "told [Richard Gattis] what was going on . . . because that—you know basically that was Rick's job" and that he "[didn't] think it ever got resolved." The Goodwill employee testified that Gattis was the electrical subcontractor on this job and the prior job from 2010 and that there were no other electrical subcontractors working in the area where the incident occurred after 2010.

Lawhon's expert who was an electrical engineer and master electrician testified about the duties and responsibilities of an electrical subcontractor and opined that Gattis had a culture of unsafe practices at this job site and that it had failed to comply with its duty "to make sure that the work site [was] free from recognized hazards," including failing to correctly label the electrical breakers and identify the overfilled junction box, to put in place lockout/tagout procedures, and to make sure that the electricians had ready access to the electrical closet when needed. Lawson's evidence also included the master subcontract between Burt-Watts and Gattis in which Gattis agreed to be responsible for safety and "competent supervision" of the electrical work for the job.[5]

---

[5] Paragraph 16 of the master subcontract agreement, entitled "Responsibilities," states that the "Subcontractor shall furnish all labor, materials, equipment, services, and tools including, but not limited to, competent supervision . . . as are necessary for the proper performance of Subcontractor's Work." Paragraph 22, entitled "Safety," provides that the "prevention of accidents on or in the vicinity of Subcontractor's Work is Subcontractor's responsibility." Additionally, Gattis was required to "establish a safety program implementing safety measures, policies, and standards conforming to those required or recommended by governmental and quasi-governmental authorities having jurisdiction."

Gattis's defensive theory as to liability was that Lawhon was responsible for his injury because he was told not to work hot but continued to do so. Gattis provided evidence to support findings that the job was not behind schedule, that the electricians had access to the electrical closet, and that no one pressured or pushed the electricians to work hot in order to speed up the project. According to Gattis, Lawhon should have turned off the power before beginning his work to move the exit sign. The superintendent testified that Lawhon could have called him on his cell phone, that the electricians were free to turn off the power on Saturdays, that no one complained that the allotted time for turning the power off during the work week was insufficient, and that he had shown Lawhon how to access the electrical closet without a key. Richard Gattis also testified that he instructed Lawhon not to work hot, and the superintendent testified that he never told Lawhon or any of the other electricians to work hot.

The trial court submitted the case to the jury with questions regarding the extent of Goodwill's and Burt-Watts's "control over the manner in which the injury-causing work was performed" and a question regarding the negligence of Gattis, Burt-Watts, Lawhon, and Kosich, which stated with its instructions:

> Did the negligence, if any, of those named below proximately cause the occurrence in question?
>
> For Question No. 5, "negligence," when used with respect to the conduct of Burt-Watts Industries, Inc., Gattis Electric, Inc. and Kosich LLC, means failure to use ordinary care, that is, failing to do that which a contractor of ordinary prudence would have done under the same or similar circumstances or doing that which a contractor of ordinary prudence would not have done under the same or similar circumstances.

For Question No. 5, "ordinary care," when used with respect to the conduct of Burt-Watts Industries, Inc., Gattis Electric, Inc. and Kosich LLC, means that degree of care that would be used by a contractor of ordinary prudence under the same or similar circumstances.

"Negligence," when used with respect to the conduct of James Lawhon, means failure to use ordinary care, that is, failing to do that which an electrician of ordinary prudence would have done under the same or similar circumstances or doing that which an electrician of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care," when used with respect to the conduct of James Lawhon, means that degree of care that would be used by an electrician of ordinary prudence under the same or similar circumstances.

"Proximate cause" means a cause that was a substantial factor in bringing about an occurrence, and without which cause such occurrence would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the occurrence, or some similar occurrence, might reasonably result therefrom. There may be more than one proximate cause of an occurrence.

Burt-Watts settled with Lawhon before the jury returned the verdict. The jury answered "yes" that Burt-Watts "exercise[d] some control over the manner in which the injury-causing work was performed," found Burt-Watts, Gattis, and Lawhon negligent, and attributed the percentage of responsibility as follows: Lawhon 50%, Burt-Watts 25%, and Gattis 25%.

Gattis moved for judgment notwithstanding the verdict and for new trial. In its motion, Gattis argued that it owed no duty to Lawhon because Lawhon's injury stemmed from a premises defect claim and Lawhon failed to obtain the jury findings that would be required for a premises defect claim against Gattis. Alternatively, Gattis argued that Lawhon failed to submit a jury question on the issue of Gattis's control over Lawhon's work. Gattis also claimed that the

6

evidence was legally and factually insufficient to support the jury's negligence and causation findings as to Gattis. The district court denied the motion, and this appeal followed.

## STANDARD OF REVIEW

Gattis's issues challenge the trial court's denial of its motion for judgment notwithstanding the verdict and for new trial. The denial of a motion for judgment notwithstanding the verdict is reviewed under the legal sufficiency standard of review. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810, 823 (Tex. 2005). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id*. at 827. "[A]ppellate courts must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id.* at 807.

Denial of a motion for new trial is reviewed for abuse of discretion. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010); *Strackbein v. Prewitt*, 671 S.W.2d 37, 38 (Tex. 1984); *see Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985) (describing abuse of discretion standard).

## DISCUSSION

### Theory of Liability

Lawhon pleaded claims against Gattis under an ordinary negligence theory of liability. *See Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990) (listing elements of negligence to include legal duty owed to plaintiff, breach of duty, and damages proximately caused by breach); *see also Ewing Constr. Co. v. Amerisure Ins. Co.*, 420 S.W.3d 30,

7

37 (Tex. 2014) ("Negligence means the failure to use ordinary care, that is failing to do that which a reasonable person or provider of the defendant's type would have done under the same or similar circumstances." (citing *20801, Inc. v. Parker*, 249 S.W.3d 392, 398 (Tex. 2008)). In his pleadings, Lawhon asserted that "Gattis Electric was the contractor in charge of the electrical work and directly supervised [Lawhon]," Gattis "gave direct instructions to [Lawhon], including the insistence that [Lawhon] work on live current," "Gattis failed to adequately protect its workers at the site by stepping in [and] communicating with Burt-Watts that the workers should not be required to work under such conditions," and "Gattis was actively negligent in its conduct and this negligence was a proximate cause of [Lawhon]'s injuries." Consistent with these pleadings, the district court submitted Lawhon's claims against Gattis to the jury as ordinary negligence claims.

In its first issue, Gattis challenges Lawhon's theory of liability. Gattis asserts that the district court erred when it denied Gattis's motion for judgment notwithstanding the verdict because Lawhon waived his only viable claim by failing to secure jury "findings on the required premises defect elements or Gattis' exercise of control." *See* Tex. R. Civ. P. 279 (addressing omissions from the charge); *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 529 (Tex. 1997) ("Because premises defect cases and negligent activity cases are based on independent theories of recovery, a simple negligence question, unaccompanied by the [premises defect] elements as instructions or definitions, cannot support a recovery in a premises defect case."). As part of its second issue, Gattis

8

similarly argues Lawhon's failure to obtain a jury finding as to Gattis's control over the injury-producing work precludes any recovery against Gattis.[6]

Gattis equates the duties an electrical subcontractor owes to its own electricians with the duties that a general contractor or a property owner owes to an independent contractor's employees. To support this position, Gattis cites cases distinguishing between negligent-activity and premises-defect theories of recovery against property owners, occupiers, and general contractors. *See Olivo*, 952 S.W.2d at 527–28 (describing "two types of premises defects for which an independent contractor's employee may seek to hold the general contractor liable" as negligence arising from activity on premises and negligence arising from premises defect, which is condition on the premises);[7] *see also Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 775 (Tex. 2010)

---

[6] In his briefing to this Court, Lawhon argues that Gattis waived these arguments because they concern jury charge error, and Gattis failed to raise the arguments with the district court prior to the case being submitted to the jury. *See* Tex. R. Civ. P. 272 ("[O]bjections shall in every instance be presented to the court in writing, or be dictated to the court reporter in the presence of the court and opposing counsel, before the charge is read to the jury. All objections not so presented shall be considered as waived."). On this record, we decline to conclude that Gattis has waived its arguments challenging Gattis's theory of liability. *See* Tex. R. Civ. P. 279; *Custom Transit, L.P. v. Flatrolled Steel, Inc.*, 375 S.W.3d 337, 362–63 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (noting "difference between omitting certain elements of a single theory — which is addressed by Rule 279's deemed finding mechanism — and omitting all elements of an entirely separate and distinct theory"); *Saenz v. David & David Constr. Co.*, 52 S.W.3d 807, 813–14 (Tex. App.—San Antonio 2001, pet. denied) (addressing failure to submit jury question on premises defect theory with "requisite control issue").

[7] *See, e.g.*, *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992) (action by customer for slip and fall against grocery store occupying premises); *Shell Chem. Co. v. Lamb*, 493 S.W.2d 742, 743 (Tex. 1973) (action against general contractor); *Mangham v. YMCA of Austin, Tex.-Hays Cmtys.*, 408 S.W.3d 923, 925 (Tex. App.— Austin 2013, no pet.) (action against premises owner)*; Durbin v. Culberson Cnty.*, 132 S.W.3d 650, 655 (Tex. App.—El Paso 2004, no pet.) (action against premises owner); *Wal-Mart Stores, Inc. v. Garza*, 27 S.W.3d 64, 66–67 (Tex. App.—San Antonio 2000, pet. denied) (action against occupier of premises).

(distinguishing "negligent-activity and premises-defect theories of liability" against premises owner); *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001) (describing general contractor's duties in negligence context when general contractor retains control over independent contractor's work); *Elliott-Williams Co. v. Diaz*, 9 S.W.3d 801, 803–04 (Tex. 1999) (noting that "general contractor normally does not have a duty to see that independent contractor performs work safely" but that duty arises when general contractor retains control over the "means, method, or details of the independent contractor's work"); *Saenz v. David & David Constr. Co.*, 52 S.W.3d 807, 810–12 (Tex. App.—San Antonio 2001, pet. denied) (contrasting negligent activity and premises defect in context of general contractor's liability to subcontractor's employee).

We, however, find these cases inapposite. Gattis was the electrical subcontractor—not the property owner or the general contractor on the job—responsible for the electrical work. Although Kosich provided Lawhon and other electricians to Gattis to staff Gattis's manpower needs for the job, it was undisputed at trial that Gattis was responsible for the electrical work and supervising Lawhon. The owner of Kosich testified that Gattis had the authority to fire Lawhon, and other evidence at trial supported a finding that Kosich's role was limited to providing manpower to Gattis for the project. In this context, Gattis owed duties to Lawhon under general negligence principles. *See, e.g.*, *Austin v. Kroger Tex., L.P.*, No. 14-0216, ___ S.W.3d ___, 2015 WL 3641066, at *26–27 (Tex. June 12, 2015) (noting that landowner's additional relationship as employer of injured employee "[gave] rise to additional duties, such as a duty to provide necessary equipment, training, and supervision" and rejecting argument that landowner's lack of any negligent activity contemporaneous with injury defeated claim that landowner's "negligent failure to provide

10

[ ] system also caused [employee's] injury"); *Jenkins v. Occidental Chem. Corp*., 415 S.W.3d 14, 38–39 (Tex. App.—Houston [1st Dist.] 2013, pet. granted) (declining to extend premises-defect/negligent-activity distinction to claims against non-owner and non-occupier defendants and holding that company did not owe same duty as an owner or occupier to make premises safe but that it did owe duty to be non-negligent in design of machine); *see also Colvin v. Red Steel Co.*, 682 S.W.2d 243, 245 (Tex. 1984) (holding that fabricator of steel trusses and purlins used in building who was not owner or occupier was liable to steel worker injured on construction site, and standard of care owed by fabricator "was to act as a reasonable prudent person would act under the same or similar circumstances regarding any reasonably foreseeable risk"); Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Premises Liability* PJC 65.2 (2014) (addressing instructions for negligence and ordinary care of plaintiffs and defendants other than owners or occupiers of premises and stating that standard of care is one of ordinary care).

Based on Lawhon's pleadings and the evidence submitted at trial, we conclude that the district court did not err when it submitted Lawhon's claims against Gattis to the jury under an ordinary negligence theory of liability and without a question of Gattis's control over the injury-producing work. It thus did not err when it denied Gattis's post-trial motions challenging Lawhon's theory of liability. On this basis, we overrule Gattis's first issue and its second issue to the extent Gattis asserts that Lawhon failed to obtain a jury finding on Gattis's control over the injury-producing work.

11

**Sufficiency of Evidence to Support the Jury's Finding of Negligence**

In the remainder of its second issue, Gattis urges that the district court erred in denying its post-trial motions because the evidence was legally and factually insufficient to support the jury findings that it was negligent and that its negligence proximately caused Lawhon's injury. *See City of Keller*, 168 S.W.3d at 807, 810, 827 (describing legal sufficiency standard of review); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (describing factual sufficiency standard of review); *see also Phillips*, 801 S.W.2d at 525 (listing elements of negligence claim).

The jury was instructed that "negligence," with respect to the conduct of Gattis "means failure to use ordinary care, that is, failing to do that which a contractor of ordinary prudence would have done under the same or similar circumstances or doing that which a contractor of ordinary prudence would not have done under the same or similar circumstances." The jury also was instructed that "'[p]roximate cause' means a cause that was a substantial factor in bringing about an occurrence, and without which cause such occurrence would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the occurrence, or some similar occurrence, might reasonably result therefrom. There may be more than one proximate cause of an occurrence."

Evidence supporting the jury findings that Gattis was negligent and that its negligence was a proximate cause of Lawhon's injury includes:

- Testimony that Gattis was responsible for the electrical work on the project in the area of the job where the incident occurred from 2010 forward, that no other electrical subcontractor worked in the area during that time, and that Gattis knew that Lawhon was being instructed to work hot but did not take action to prevent an incident from occurring.

12

- Testimony that Richard Gattis had told Lawhon to follow the superintendent's instructions and that the superintendent had instructed Lawhon to work hot and, on the day of the incident, to move the exit sign.

- Testimony that Gattis did not implement required safety programs or complete a job hazard analysis.

- Expert testimony that Gattis failed to conform with applicable regulations and codes[8] and to provide supervision, and that a journeyman electrician's responsibility on the job site was "to follow the directions of his supervisor."

- Testimony that Gattis failed to ensure that the electricians had access to the electrical room to cut off power when needed.

- Testimony that Gattis had not implemented a functioning lockout/tagout procedure.

- Expert testimony that industry standards required both the general contractor and the electrical subcontractor to identify hazardous conditions that might pose a risk to their employees and to implement safety protocols.

- The master subcontract between Burt-Watts and Gattis for the electrical subcontracting work, which placed the responsibility for safety and supervision for the electrical work on Gattis.

Based on this evidence, the jury could have concluded that Gattis breached the duty of care that a reasonable, prudent electrical subcontractor owed to its electricians working on the job site and that the breach was a proximate cause of Lawhon's injury. The jury also could have concluded that

---

[8] OSHA regulations state that "[n]o employer shall permit an employee to work in such proximity to any part of an electric power circuit that the employee could contact the electric power circuit in the course of work, unless the employee is protected against electric shock by deenergizing the circuit and grounding it or by guarding it effectively by insulation or other means." 29 C.F.R. § 1926.416(a)(1). Another section states that "[l]ive parts to which an employee may be exposed shall be deenergized before the employee works on or near them, unless the employer can demonstrate that deenergizing introduces additional or increased hazards or is infeasible due to equipment design or operational limitations." *Id.* § 1910.333(a)(1).

13

Lawhon would not have touched the live circuit if Gattis had: (i) correctly installed or fixed the overfilled junction box that was not within code, (ii) properly labeled the circuit breakers and ensured that the electricians had ready access to the electric closet, (iii) performed a job hazard analysis and implemented a lockout, tagout procedure, or (iv) provided clear guidance to Lawhon as to the superintendent's instructions.

There is conflicting evidence in the record. For example, Gattis's witnesses provided testimony to support a finding that Lawhon's own negligence was the cause of his injury. It was undisputed that Gattis's work on the job site in 2010 had passed inspection, the superintendent testified that he did not tell the electricians to work hot and that they had access to the electric closet to turn the power off, and other evidence supported a finding that Lawhon was disobeying Richard Gattis's instruction not to work hot. It was for the jury, however, to resolve the conflicting evidence and to judge the credibility of the witnesses and the weight to be given to their testimony. *See City of Keller*, 168 S.W.3d at 819; *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986).

Although Lawhon was unable to testify because of his injury, the jury could have credited the evidence of the impending penalties if the job was not completed by April 30; Gattis's failure to implement safety protocols or to ensure access to the electrical closet; and the likely termination of the superintendent's employment were he to have admitted that he told Lawhon to work hot. Crediting this evidence, the jury could have disbelieved Richard Gattis and the superintendent, who were both interested witnesses in the outcome, as to their instructions to Lawhon. *See City of Keller*, 168 S.W.3d at 819; *McGalliard*, 722 S.W.2d at 697 ("The uncontradicted testimony of an interested witness cannot be considered as doing more than raising

14

an issue of fact unless that testimony is clear, direct, and positive, and there are no circumstances in evidence tending to discredit or impeach such testimony.").

Viewing the evidence in the light most favorable to the findings, we conclude that it is legally sufficient to support the challenged jury findings. *See City of Keller*, 168 S.W.3d at 810, 827. Further, based on our review of the evidence, we cannot conclude that the weight of the evidence is so contrary to the jury's findings as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. Thus, we conclude that there is factually sufficient evidence to support the challenged jury findings. Because we conclude that the evidence was sufficient to support the jury's challenged findings, we overrule the remainder of Gattis's second issue.

**Premises Liability Elements**

In its third issue, Gattis urges that, "assuming that Lawhon had requested jury questions on his only legally viable claim, there is no legally or factually sufficient evidence to support the premises defect elements or any finding that Gattis exercised control over Lawhon's injury-producing work." This issue is premised on Gattis's contention that this case is a premises defect case or a negligent activity case. Because we have concluded otherwise, we overrule Gattis's third issue on this basis.

**CONCLUSION**

Having overruled Gattis's issues, we affirm the district court's judgment.

_____
Melissa Goodwin, Justice

Before Chief Justice Rose, Justices Goodwin and Bourland

Affirmed

Filed:   August 26, 2015